PC SCAN

United States District Court
Northern District of Illinois

Scanned at Pinckneyville CC and e-mailed
4/17/25 by CB 52 pages
Date Initials No.

RECEIVED
4/17/2025
GMM
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

Calvin Mayfield,
Plaintiff,

v.

Ryan Woods
Latoya Hughes
Ms. Pontwood
Lt. Martin
Lt. Booker
Crystal Latigo
Craig Carlock
Matthew Petty
DAve Martin
Ryan Nothnagle
Chief Escamilla
Defendants,

Complaint
Case No.

1:25-cv-04234
Judge John F. Kness
Magistrate Judge Keri L. Holleb Hotaling
RANDOM / Cat. 3
PC 7

I. Jurisdiction and Venue

1. This is a civil action authorized by 42 U.S.C. Section 1983 to redress the deprivation, under color of state law, or rights served by the Constitution of the United States. The court has jurisdiction under 28 U.S.C. Section 1331 and 1343 (a)(3). Plaintiff seeks declatory relief pursuant to 28 U.S.C. Section 2201 and 2203. Plaintiff's claims for injunctive relief are authorized by 28 U.S.C. Section procedure. This court has supplemental jurisdiction over plaintiff's state-law claims pursuant to 28 U.S.C. § 1367.

2. The Northern District of Illinois is an appropriate venue under 28 U.S.C. section 1391 (b)(2) because it is where the events giving rise to this claim occurred.

II Plaintiff

3. Plaintiff, Calvin Mayfield is and was at all times mentioned herein a prisoner of the State of Illinois in the custody of the Illinois Department of corrections He is currently confined in Pinckneyville C.C., in Pinckneyville IL.

III Defendants

4. Defendant, Ryan Woods is the Warden of Sheridan C.C. He is legally responsible for the operation of Sheridan C.C. and for the welfare of all the inmates in that prison.

5. Defendant, Latoya Hughes is the Director of the Illinois Department of corrections. She is legally responsible for the overall operation of the Department and each institution under its jurisdiction, including Sheridan C.C.

6. Defendant, Pont wood is the program Warden at Sheridan C.C. She is responsible for overseeing the operations of all the programs at Sheridan C.C.

7. Defendant, Lt. Martin is a correctional officer of the Illinois Department of corrections who, at all times mentioned in this complaint, held the rank of lieutenant and was assigned to Sheridan C.C.

8. Defendant, Lt. Booker is a correctional officer of

the Illinois Department of corrections who, at all times mentioned in this complaint, held the rank of of lieutenant and was assigned to Sheridan C.C.

9. Defendant, Crystal Latigo is a Correctional officer of the Illinois Department of Corrections who, at all times mentioned in this complaint, was assigned to Sheridan C.C.

10. Defendant, Craig Carlock is a Correctional officer of the Illinois Department of Corrections who, at all times mentioned in this complaint, held the rank of lieutenant and was assigned to Sheridan C.C.

11. Defendant, Matthew Petty is a correctional officer of the Illinois Department of corrections who, at all times mentioned in this complaint, held the rank of Sergeant and was assigned to Sheridan C.C.

12. Defendant, Escamilla is a Correctional officer of the Illinois Department of Corrections who, at all times mentioned in this complaint, held the rank of Chief of IA and Intel and was assigned to Springfield.

13. Defendant, Dave Martin is the mailroom supervisor at Sheridan C.C. He is responsible for supervising the mailroom staff, and all of their responsibilities.

14. Defendant, Ryan Nothnagle is a member of the Administrative Review Board (ARB). He is responsible for reviewing an responding to inmate grievances that were submitted to the ARB.

15. Each defendant is sued individually and in his [or her] official capacity. At all times mentioned in this complaint, each defendant acted under the color of state law.

IV Previous Lawsuits

A. Mayfield v. Woodward, et al., 22-3200-JEH

B. September 2022

C. Calvin Mayfield

D. Michael Woodward, Kaycee Peterman, Troy Ham, Justin Maher

E. U.S. District Court-Central District of Illinois - Urbana

F. Originally assigned to Colin S. Bruce. Now, Jonathan E. Hawley

G. 1983 Civil Rights Violations

H. Still Pending

A2. Mayfield v. Loos, et al. 23-1642-DWD

B2. May 2023

C2. Calvin Mayfield

D2. Rose Loos, David Mitchell, Richard Oakley, Cathy McClure, Shannon Denman.

E2. US District Court - Southern District of Illinois

F2. David W. Dugan

G2. 1983 Civil Rights violation

H2. IDOC Defendants settled. Wexford Defendants still Pending.

I2. Settlement with IDOC reached in May 2024.

A3. Mayfield v. Mitchell, et al. 24-1869-SPM

B3. August 2024

C3. Calvin Mayfield

D3. Mac Shane Frank, Rachel Aquiniga, Brook Beasley

E3. U.S. District court - Southern District of Illinois

F3. Stephen P. McGlynn

G3. 1983 Civil Rights Violations

H3. Still pending

A4. Mayfield v. IDOC

B4. 2023

C4. Calvin Mayfield

D4. IDOC

E4. Court of Claims-Illinois

F4. Unknown

G4. Property Loss

H4. Settled

I4. 2023

V Statement of Claim

16. on November 25, 2020, (at western C.C.) Plaintiff CAlvin Mayfield had a scheduled 1on1 mental health session with a mental health Professional (M.H.P). Plaintiff is Classified as having a serious mental illness (S.M.I.).

17 During this forty-eight (48) minute session Plaintiff pleaded with his M.H.P. to help him get moved out of his cell because of issues he was having with his cellmate.

18. He told her that, at that moment, his new cellmate was "up in their cell with his shoes on ready to fight." The M.H.P. repeatedly told him "It's not my job."

19. Towards the end of the Session the Cell house Sergeant entered.

20. Plaintiff told the Sergeant that his cellmat had put his shoes on and was ready to fight

21. He asked the sergeant to help him or his Cellmate get moved to another cell.

22. The Sergeant did not help Plaintiff and would eventually send him back to his cell without investigating Plaintiff's claims.

23. The following day, November 26, 2020, approximately fourteen (14) hours after Plaintiff was denied help by mental health and security, he was violently attacked by his cellmate. A mentally ill man that was 110 pounds larger than Plaintiff.

24. Approximately two (2) months before Plaintiff was attacked, his cellmate wrote mental health and said, "I have anti Sochole [sic] Disorder. I don't supposed to be in a room with another inmate. He could get hurt." (Ex. complaint #01)

25. The staff at Western C.C. failed to protect Plaintiff from an iminent threat which led to Plaintiff being attacked.

26. Plaintiff was forced to defend himself which resulted in the death of his cellmate

27. Shortly after the attack an IDOC investigator placed Plaintiff on a continuous crisis watch due to Plaintiff's mental health history, the violence of the attack, and the mental trauma Plaintiff suffered as a result.

28. Plaintiff would spend five (5) day on crisis watch. This would be plaintiff's first time on crisis watch while in the IDOC.

29. Plaintiff would be diagnosed with PTSD from the attack and death of his cellmate

30. Plaintiff would spend fifty-five (55) days in segregation, at

menard, while under investigation for the death of his cellmate.

31. On January 25, 2021, Plaintiff was released from segregation and placed in general population.

32. The IDOC ruled the incident "self-defense," and Plaintiff was not disciplined by the IDOC.

33. The Brown County State's Attorney declined to prosecute.

34. Plaintiff was informed by IA/Intel that the matter was closed and the incident would be expunged from Plaintiff's master file.

35. While housed at Menard C.C. Plaintiff was given single cell status per mental health and security.

36. Plaintiff was transferred to Pinckneyville C.C. in September 2021.

37. Plaintiff was again given single cell status while at Pinckneyville C.C.

38. In March 2024, Pinckneyville C.C. posted an application on the inmate's tablet for Northwester Prison Education Program (NPEP).

39. Plaintiff would submit his application to NPEP in April 2024.

40. NPEP is an in person bachelor's degree program offered by Northwestern University - at no cost to the inmate (Ex Complaint Group A).

41. Upon information and belief Northwestern University is

the only top 10 university in the country that offers an in person bachelor's degree program to incarcerated individuals -

42. The program began at Stateville C.C. in 2018 but was moved to Sheridan C.C. in 2024 due to Stateville C.C. closing.

43. Plaintiff met all the requirements to participate in NPEP, established by NPEP and the IDOC (Ex. Complaint # 02, 02A).

44. Ex. Complaint # 02 states that applicants must have at least twelve (12) months infraction free behavior.

45. Plaintiff has been incarcerated in the IDOC since 2012 and has only had two (2) disciplinary tickets.

46. Neither of these tickets sent plaintiff to Segregation (Ex. Complaint # 03).

47. Ex Complaint # 02A at ¶ 2 states that "Applicants will be Screened for meeting the minimum NPEP acceptance requirements/ prerequisites. All applications that meet the baseline requirements will be screened by IDOC." (Ex Complaint # 02A at ¶ 2).

48. Plaintiff's application would be accepted and he would be chosen for an in person interview conducted by a representative from NPEP (Ex. Complaint # 16).

49. Hundreds of individuals applied to NPEP. Approximately twenty (20) inmates would be accepted - including Plaintiff (Ex. Complaint # 04).

50. In late August 2024, Plaintiff signed his letter of confirmation

to NPEP thus entering into a contract with NPEP and the IDOC to participate in NPEP and remain in the program until completion.

51. Upon information and belief, inmates enrolled in college courses have transfer holds placed on them to allow them to remain at the institution while they are completing the program.

52. Plaintiff would be submitted to transfer to Sheridan C.C. by his counselor at Pinckneyville C.C. in August 2024.

53. "once accepted and confirmed, Student will be enrolled in Fall 2024 classes. Prior to the start of Fall 2024 Classes, Students not already at Sheridan Correctional Center will be transferred to Sheridan Correctional Center (Ex-Complaint # 02A).

54. Plaintiff would be approved to transfer to Sheridan C.C. by the transfer Coordinator in Springfield.

55. Upon information and belief, as the Warden of Sheridan C.C., Defendant Woods would have had to approve Plaintiff's transfer to Sheridan C.C. as well.

56 Plaintiff would be transferred to Sheridan C.C. on September 11, 2024, to begin NPEP the following week.

57. When plaintiff arrived at Sheridan C.C. he went through the intake process. One of the stops was mental health.

58. While plaintiff was speaking to M.H.P. Mullens he informed her of his fear and concern of being housed in a cell

with another inmate.

59. M.H.P. Mullens did not know if plaintiff would be single celled, but after their interview she informed plaintiff that she had called a lieutenant and informed him (or her) of Mayfield's concern.

60. Plaintiff, along with all the other new NPEP students, was taken to their cell house (building C23) to receive their cell assignments.

61. When Plaintiff went to his assigned cell he saw that there was already an inmate living in the cell.

62. Plaintiff approached Defendant Latigo. She was the wing officer and the officer that gave him the cell number to go to.

63. Placement officers assigned plaintiff to the cell. Defendant Latigo only informed him of the cell number

64. As wing officer defendant Latigo would have no control over inmates cell assignments

65. Following procedure and chain of command Plaintiff would have to speak to his wing officer before speaking to anybody else. About any issues he may have in the house.

66. Plaintiff, politely and calmly, approached Defendant Latigo and said, "there's somebody already in the cell I was assigned to. I've been single celled at my last two facilities. Can you call IA and mental health and see if it's noted in my file. I do not feel safe in the cell with another person."

67. Plaintiff was voicing a legitimate concern to Defendant Latigo. At no time did plaintiff intend to or think that he was violating any rules or acting inappropriately.

68. Defendant Latigo did not appear to be bothered by Plaintiff's comments. She told Plaintiff to wait in the dayroom while she called.

69. While Plaintiff was waiting the cell house was preparing to walk to dinner.

70. Defendant Latigo told Plaintiff that he could walk to dinner with the house.

71. Before plaintiff walked to dinner Defendant Latigo placed his property bag into the cell he was assigned to so "it wouldn't go missing," she said.

72. When the cell house returned from dinner plaintiff stayed in the dayroom as defendant Latigo had instructed.

73. While waiting in the dayroom plaintiff spoke to another inmate he knew from his time a Stateville C.C. A man he knew as Tony Triplett. A recent NPEP graduate

74. Mr. Triplett was working in C23 as a porter — or an inmate janitor.

75. Mr. Triplett overheard what plaintiff told Defendant Latigo and he informed plaintiff that he had a single cell at Sheridan C.C. due to him using a C-pap machine.

76. Mr. Triplett informed plaintiff that there were numerous open cells in C23 at that time.

77. Building C23 was only housing NPEP students. This was NPEPs first semester at Sheridan C.C. All the students from the other cohorts had not been transferred into Sheridan C.C. from Stateville C.C. yet.

78. At one point Defendant Latigo approached plaintiff and told him that she was about to begin running showers. She asked plaintiff if he would like to take a shower. Plaintiff declined.

79. Defendant Latigo's demenor at that time was calm and she showed no anger or irritation towards plaintiff.

80. A short time later, two lietenants and a sergeant entered C23. Defendant Martin and upon information and belief, Defendant Booker were the two lieutenants.

81 Plaintiff referred to Defendant Booker as "Jane Doe" in his grievance.

82. The Sergeant approached plaintiff and told him to "cuff up!" which plaintiff did.

83. Plaintiff asked why he was being restrained.

84. Defendant Booker said, "for refusing housing."

85 Plaintiff said, "I never refused anything."

86. Defendant Booker said, "I know, but the warden wants you to go to Restrictive housing (segregation)."

87. Defendant Booker or Martin did not ask plaintiff if he was refusing to lock up. They never ordered him to lock up. They never offered him alternative housing - per procedure

88. Defendant Booker acknowledged that plaintiff had not refused housing or violated any rules. Yet, she was taking him to segregation and her or Defendant Martin would not object to him receiving a ticket.

89. Plaintiff thought that it was unusual that the Defendants had contacted the Warden at that time of day for an issue as minor as a cell assignment.

90. As Plaintiff was being escorted to Segregation he briefly explained to Defendant Booker why he had been single celled in the past.

91. Defendant Booker said that Sheridan would call Pinckneyville IA and if plaintiff's story "checks out" then plaintiff should be returned to C23 by 8Am the following day.

92. Plaintiff would never be returned to C23.

93. The following day, September 12, 2024, Plaintiff would be issued a ticket for "disobeying a direct order essential to safety and security" and "unauthorized movement." (Ex. complaint #05)

94. This ticket was written by Defendant Latigo in retaliation for plaintiff exercising his first Amendment rights.

95. Defendant Latigo alleged that Plaintiff refused his housing assignment.

96. upon information and belief, the ticket was fabricated by defendant Latigo, Co-signed by defendants Martin and Booker, based on orders from defendant woods.

97. Upon information and belief, this act of malicious deceipt was conspired for the sole purpose of giving defendant Woods an excuse to Void Plaintiff's contract and transfer him out of Sheridan C.C.

98. The disciplinary report written by defendant Latigo states," on the above date and approximate time while intake was moving into C23, Individual Mayfield M31580 approached me and stated 'Hey C/O I'M not taking a Cellie. I've murdered my cellie before. It's a security risk.' I advised Lt. Martin and Lt. Booker Mayfield was escorted to restrictive housing." (Ex-Complaint #05).

99. Plaintiff never said that to defendant Latigo.

100. Plaintiff never refused to go into the cell.

101. Plaintiff was never told to go into the cell by any officers.

102. Plaintiff never refused or disobeyed any orders because no orders were ever issued to him.

103. Plaintiff was written the ticket in retaliation for him informing defendant Latigo that he had previously been Single celled and that he did not feel safe in a cell with another Person

104. Before this incident Plaintiff had never received a

disciplinary ticket that sent him to Segregation.

105. Plaintiff does not have a history of telling officers what he will or will not do.

106. Plaintiff had just arrived at Sheridan C.C. because he was accepted into NPEP. He would not do something as dumb as refusing housing and put an incredible opportunity like NPEP in jepordy - on his first day there.

107. Defendant Latigo was a wing officer. She had no control over inmates cell assignments so Plaintiff would have no reason to say that to her.

108 That is why he asked her to call IA and mental health. They are the only ones that would be aware of why plaintiff had been single celled and could have recommended a cell change.

109. The bottom of the disciplinary report (DOC 0317) has a section for the inmate that received the ticket to fill out to request witnesses be interviewed before their disciplinary hearing.

110. Plaintiff filled out this request slip and placed it in the appropriate box while he was in segregation in building C4.

111. Plaintiff requested that the video surveillance footage from C23 be viewed during the appropriate time from September 11, 2024.

112. Plaintiff also requested that inmate Triplett be interviewed as well as the Major that walked him to segregation on September 11, 2024. Upon information and belief, the Major was actually defendant Booker. Majors and lieutenants both wear white shirts.

113. The video would have shown plaintiff sitting patiently in the dayroom.

114. It would have shown three (3) brief interactions between plaintiff and defendant Latigo. It would not have shown any interaction that would have led to plaintiff needing to be restrained.

115. Defendant Carlock came to Plaintiff's cell front on September 17, 2024, for plaintiff's disciplinary hearing.

116. Defendant Carlock never viewed the surveillance footage or spoke to the witnesses plaintiff requested.

117 The right to call witnesses and to present documentary evidence, when to do so will not unduly jeopardize institutional safety or correctional goals.

118 Defendant carlock began by reading plaintiff defendant Latigo's written report.

119 Plaintiff responded by telling defendant Carlock what he actually said to defendant Latigo.

120. Plaintiff explained why he had been single celled at his previous two facilities.

121 Plaintiff told Defendant Carlock that he never refused housing. He just asked Defendant Latigo to call IA and mental health.

122. He told Defendant Carlock that the only reason he came to Sheridan C.C. was to get an education. Not to cause trouble.

123 Defendant Carlock said there are two (2) options available.

124 He said Plaintiff could get "C grade" or the Warden (Defendant Woods) can make it all "go away."

125 C grade is a demotion in grade with a loss of priviledges. No phone calls, no dayroom, no emails, No video visits, loss of job and/or school/program, can only purchase hygiene items on commissary, and No audio visual devices (tablets and t.v.). The only difference between Segregation and C grade is that on C grade you get more of your property and you get to walk to meals.

126 Defendant Carlock said, "The warden wants to know if you are stable enough to have a cellie."

127 Plaintiff said, "yes. But shouldn't that be up to IA and mental health to decide."

128 Defendant Carlock responded "C grade it is," then walked away. Plaintiff would be moved to C8 (C grade house) a short time later.

129 Defendants Carlock and Petty would find Plaintiff guilty of "Disobeying a Direct order Essential to Safety and Security" (215) and "Unauthorized Movement" (307).

130. Neither defendant's Booker or Martin would speak on Plaintiff's behalf and explain that they were both aware that plaintiff never refused housing

131. Defendant Petty was not even present at plaintiff's hearing but still found him guilty

132 Defendants Carlock and Petty recommended: Seven (7) days in segregation, thirty (30) days of C grade, thirty (30) days of B grade, and a disciplinary transfer for refusing housing. They recommended kicking him out of the prison for refusing housing.

133. All because plaintiff told defendant Latigo that he had been previously single celled and didn't feel safe in a cell with another person.

134. Defendants Carlock and Pettys basis for their decision was based on the written report of defendant Latigo (Ex Complaint # 06, 06A).

135. The Adjustment Committee Final Report states that defendant Latigo's written report states that Mayfield approached her and stated "hey c/o, I'm not taking a cellie. I've murdered a cellie before. It's a security risk." Lt. Martin and Booker advised. (Ex. Complaint # 06, 06A).

136. That is the only evidence that Defendants Carlock and Petty used to find plaintiff guilty, discipline him severely,

and for Defendant Woods to approve of their discipline.

137 The inmate orientation manual gives the following definition for a 215 Disobeying A Direct ORDER Essential to Safety and security: "Willfully refusing, or neglecting to comply with, an order when continued refusal results in a use of force to maintain the Safety and Security of a facility. This shall include, but not be limited to, refusing to submit to a search, refusing to submit to the application of mechanical restraints, refusing a designated housing assignment or refusing to leave an area" (Ex Complaint #07).

138. Defendant Latigo's written report, the evidence by which Defendants Carlock, Petty, and Woods found Plaintiff guilty, does not state that Plaintiff did any of the actions which would warrant a 215 ticket be written or found guilty of.

139 Based on a lack of evidence the ticket should have been thrown out before there was even a hearing.

140. Plaintiff denies that he said what Defendant Latigo writes he **Said**. But even her own fabricated words do not show that Plaintiff violated rule 215.

141 All Defendant Latigo writes is that Plaintiff approached her and said, "Hey c/o. I'M not taking a cellie. I've murdered a cellie before. It's a security risk."

142. Defendant Latigo does not write that Plaintiff ever

said he was refusing to lock up.

143 Defendant Latigo does not write that she gave plaintiff any commands or orders

144 She does not write that she ever asked plaintiff if he was refusing to lock up, refusing housing, or refusing a direct order.

145. She does not write that she ever told plaintiff she was giving him a direct order

146. These are typical questions an officer will ask an inmate before a 215 ticket is written.

147. The definition of a 215 refers to a "Continuous refusal." Defendant Latigo's report does not even detail one refusal — let alone the multiple times as needed per the definition (Ex. Complaint #07).

148. Defendant Latigo felt comfortable fabricating a ticket against plaintiff and didn't even attempt to substantiate the offenses she alleged because she knew that plaintiff would be found guilty regardless of what she wrote

149. Defendant Carlock was the chairperson of the Adjustment committee. His job is to review and investigate written disciplinary reports and decide if there is enough evidence to substantiate if the offenses alleged were actually committed and if they violate the rule in question.

150. when he first read defendant Latigo's written disciplinary

report he should have thrown it out due to lack of substantiation.

151 The IDOC disciplinary report (DOC 0317) notes under observation that each offense identified must be substantiated (Ex. complaint #05).

152. Defendant Latigo's written report does not substantiate a 215 or a 307 violation.

153. It is defendant Carlock and Pettys job (as members of the Adjustment committee) to know the requirements of each violation so they can properly find the inmate guilty or not guilty.

154. Upon information and belief, defendant Woods conspired with defendants Carlock and Petty by instructing them to find plaintiff guilty and recommend a disciplinary transfer - despite the lack of substantiated evidence and Plaintiffs history.

155. Even though the defendants held a disciplinary hearing it would be a violation of Plaintiff's Due process if it were retaliatory in nature.

156. Defendant Latigo's written report was fabricated but there was still truth to it.

157. Plaintiff did cause the death of his cellmate and him having a cellmate after that was deemed a security issue at his previous facilities.

158. Defendants Carlock and Petty did not consider those facts when they found him guilty and recommended that he be transferred out of Sheridan and removed from NPEP.

159 Before this incident plaintiff's last ticket was in 2019. He had never received a disciplinary ticket that sent him to segregation in his twelve (12) years in IDOC (Ex. Complaint #05).

160. Defendant Latigo's written report didn't substantiate any of the identified offenses as required.

161. Plaintiff did have a documented history of being single celled.

162. As Adjustment committee chair, Defendant Carlock is required to investigate alleged violations. He should have contacted IA about plaintiff's background. His investigation would have revealed that plaintiff had been given single cell status per security and mental health.

163. Despite these facts defendants Carlock and Petty, approved by defendant Woods, recommended the extreme discipline of having plaintiff transferred out of Sheridan C.C. denying him the opportunity to receive an education from Northwestern University - which was the only reason plaintiff was transferred to Sheridan C.C. to begin with.

164. The inmate orientation manual gives the following definition for a 313 Disobeying a Direct order: willfully refusing or neglecting to comply with an order, including the refusal to participate in educational testing; to accept a work, educational or housing assignment; or to perform a work assignment (Ex Complaint #09).

165. There was a lower level violation that would not have needed plaintiff to be restrained and taken to segregation that defendant Latigo could have alleged.

166. Upon information and belief, Defendant Woods instructed Defendants Booker and Martin to restrain plaintiff so they could upgrade his ticket to a 215 enabling them to put him in Segregation, removing him from NPEP, so they could transfer him out of Sheridan.

167. The surveillance video from September 11, 2024, would have shown plaintiff patiently waiting in the day room per defendant Latigo's instructions.

168. Video that defendants Carlock and Petty refused to view.

169. While sitting in the dayroom plaintiff was not causing a disturbance that would require him to be restrained.

170. If safety and security was an issue, plaintiff would not have been allowed to walk to dinner or offered a shower. He would have been cuffed up immediately by defendant Latigo.

171. Plaintiff was removed from general population when he went to Segregation.

172. Plaintiff was moved back to general population on or about October 14, 2024.

173. Plaintiff was assigned to a single cell once back in general population.

174. Ex Complaint #10 is confirmation that plaintiff was given single cell status at Sheridan C.C. (Ex Complaint #10).

175. Plaintiff was given single cell status by defendant Woods and the administration that was actively retaliating against him by

transferring him out of Sheridan because he informed defendant Latigo that he had previously been single celled and that he did not feel safe in a cell with another person (Ex. Complaint # 11).

176. Defendants consciously, with malicious intent, conspired to fabricate a ticket stating that Plaintiff refused housing because he didn't go into a cell with another inmate.

177 Found him guilty despite no evidence to substantiate the claims. Disciplined him with segregation, C grade, and B grade. Removed him from NPEP, and would transfer him out of Sheridan C.C.

178. Defendant Woods and his administration granted Plaintiff single cell status essentially admitting, and confirming, that plaintiff's concerns that he voiced on September 11, 2024, to defendant Latigo were valid.

179 With a phone call to Sheridan IA, a computer search by IA, and a call to Pinckneyville IA, defendants could have confirmed Plaintiff's background as early as September 12, 2024, The day Plaintiff was issued the ticket.

180 After determining that plaintiff had been single celled, defendant Woods allowed Plaintiff's discipline and mental suffering to continue.

181. Defendant Woods chose not to throw out the ticket, allowing Plaintiff to be removed from NPEP. He allowed, and approved, Defendants Carlock and Petty to find Plaintiff guilty.

182. Defendant Woods allowed plaintiff to serve seven (7) days in segregation

183. Defendant Woods allowed Plaintiff to serve thirty (30) days on C grade.

184 Defendant Woods allowed Plaintiff to serve thirty (30) days on B grade.

185 Defendant Woods allowed Plaintiff to be removed from NPEP despite the fact that the Director of NPEP, Professor Lackey, said Plaintiff could return and the Education Facility Administrator of Sheridan also said Plaintiff could return to the program.

186. Ex. Complaint #13 is a call pass Plaintiff received on October 23, 2024. A few days after Plaintiff got off of C grade.

187 The call pass is for Northwestern Study hall.

188 Once Plaintiff was off of C grade Professor Lackey and the EFA were willing to allow Plaintiff to return to the program.

189 Defendant Woods allowed Plaintiff to be transferred out of Sheridan C.C. and lose the opportunity to receive an education and degree from Northwestern University because Defendant Woods did not want Plaintiff Mayfield at Sheridan C.C.

190 Plaintiff was informed on October 29, 2024, that he would be transferred out of Sheridan the following day.

191 This caused Plaintiff to become extremly depressed and anxious.

192. Plaintiff had been approved to transfer to Sheridan

C.C. to participate in the Northwestern Prison Education program.

193 Plaintiff believed NPEP would not only help him to become a better person while in prison, but he believed that the education, and degree, would greatly increase his chances of a successful re-entry back into society, the ability to earn an income, and to be a Productive member of Society once released

194. Plaintiff believed that the opportunity was being taken away from him because he had voiced a legitamate issue to Defendant Latigo.

195. Plaintiff attempted Suicide by cutting his wrist and was only stopped when an officer came to his door to check on him.

196. Plaintiff would spend the next five (5) days on crisis Watch.

197 This would be Plaintiff's second time on crisis Watch while at Sheridan C.C.

198 Plaintiff became distressed on September 12, 2024, after finding out that he would be receiving a ticket and possibly not returning to NPEP.

199. While on crisis watch (the second time) Plaintiff went on a three (3) day hunger strike causing Defendant Woods to come speak to Plaintiff.

200. Defendant Woods came to speak with plaintiff on October 31, 2024.

201. Plaintiff briefly explained the incident that led to his cellmates death.

202. He explained that he had been single celled after that.

203. He told defendant Woods what he told defendant Latigo on September 11, 2024.

204. He told defendant Woods that he was transferred to Sheridan C.C. to participate in NPEP.

205. Defendant Woods told plaintiff that it was a "mistake" that he was transferred to Sheridan C.C.

206. Defendant Woods said that the transfer coordinator (TCO - in Springfield) did not know about the death of plaintiff's cellmate.

207. Plaintiff explained to defendant Woods that the incident between him and his cellmate was ruled self defense and was expunged from his record.

208. If it really was a mistake that plaintiff was sent to Sheridan then defendant Woods would not have needed to use the false disciplinary ticket as an excuse to have plaintiff transferred out of Sheridan C.C.

209. Defendant Woods could have had plaintiff placed in a van and sent back to Pinckneyville C.C. on September 12, 2024, the day after he arrive and they realized the "mistake."

210. Defendant woods could have had plaintiff transferred

back to Pinckneyville C.C. the following Wednesday (the normal transfer day).

211 Defendant woods did neither of these options. He allowed his staff to write the ticket and find him guilty.

212 He allowed plaintiff to sit in segregation for seven (7) days followed by thirty (30) days on C grade.

213. If plaintiff was actually sent to Sheridan C.C. by Mistake (He was not) then that would be another reason why plaintiff should have beat the ticket. Why disapline him for Springfield's "mistake."

214. when plaintiff told defendant Woods that the incident between him and his cellmate had been expunged defendant woods said he found that out when he tried to look at plaintiff's file on 360 (IDOC software) and was unable to find anything about the incident

215. He said he had to call Chief Escamilla (Head of IA/Intel) in Springfield to get the details.

216. He said that defendant Escamilla had to "dig deep" to find information about the incident.

217. Plaintiff asked defendant Woods if he "digs deep" on every inmate that transfers into Sheridan C.C. or just plaintiff. He did not answer.

218. Defendant woods treated plaintiff differently than all the other NPEP students. He called defendant Escamilla and had him only look into plaintiff's expugned file, and defendant Escamilla only divulged plaintiff's expungned file - No other NPEP students to defendant woods.

219. Plaintiff again told defendant Woods that defendant Escamilla had to dig deep because the incident was expunged from his record and can't be used against him.

220. Defendant Woods said he found out about it and that "I am using it against you. That is why you are transferring."

221. Defendant woods told Plaintiff that the ticket he received would be expunged.

222. He said that plaintiff was not being "punished" and was not being transferred for disciplinary reasons.

223. Plaintiff asked how he wasn't being punished if he's been removed from NPEP and Kicked out of Sheridan C.C.

224. He asked why he's being transferred if not for

disciplinary reasons.

225. Defendant Woods said, "because we found out about your cellie. That's why you're transferring."

226. Defendant Woods actually told Plaintiff that his ticket would be expunged, but he was still going to transfer him using his expunged file against him.

227. The incident between Plaintiff and his cellmate was not a secret.

228. Many inmates were aware of it, as well as many administrators around the state.

229. Expunging something from an inmates disciplinary file does not make it go away completely, but it removes it from their easy to find file so it will not be used against that individual in the future.

230. Plaintiff was the victim of an unprovoked attack by a mentally ill man that was 110 pounds larger than him.

231. The attack was allowed to happen despite Plaintiff pleading with both mental health and Security to help him.

232. Plaintiff should not be punished for an incident he had no control over and tried to avoid.

233. The following day, November 1, 2024, Plaintiff's grievance was affirmed and the ticket was expunged (Ex. Complaint #12A-E).

234. Plaintiff was transferred out of Sheridan C.C. on November 6, 2024.

235. Defendant Woods did not concur and sign the grievance officer's response, which expunged the ticket, until November 6, 2024 - after Plaintiff had already left Sheridan C.C.

236. In plaintiff's grievance he asked for the ticket to be expunged, Not to be transferred, and to be allowed to resume his participation in NPEP.

237. Despite the grievance being affirmed, only the ticket would be expunged.

238. Plaintiff was not allowed to return to NPEP and he was transferred.

239. Plaintiff was also forced to serve all thirty (30) days on C grade and all thirty (30) days on B grade. He was not returned to A grade until December 16, 2024. Over a month after the ticket was expunged.

240. Upon information and belief, defendant Woods was not concerned about the reprocussions of him removing plaintiff from NPEP and transferring him out of Sheridan, based on a false disciplinary report, because he knew that the ARB, and Defendant Hughes, would back him and deny plaintiff's grievance-

241. Which defendant Nothnagle and Hughes did. On February 26, 2024, and on March 17, 2025 (Ex. complaint # 15, 18)

242. When plaintiff was on crisis watch the first time he had several conversations about why he received his ticket with Sergeant Stewart.

243. Sergeant Stewart told plaintiff that he couldn't understand why plaintiff received a ticket if what he told him was accurate. He told plaintiff he was going to "look into it."

244. He returned a couple of days later and he said he spoke directly to defendant Latigo and asked her why Plaintiff was written the ticket.

245. Sergeant Stewart told Plaintiff that defendant Latigo told him that plaintiff never refused housing.

246. Defendant Latigo said that a lieutenant made her write the ticket. She said plaintiff got "Screwed."

247. Sergeant Stewart told Plaintiff that if he never said anything to Defendant Latigo he would still be in NPEP.

248. While plaintiff was housed in general population he met two (2) men who were similarly situated as him

249. One was a man named Alexis Santana.

250. Mr. Santana was at Sheridan C.C. to participate in the Lewis University degree program.

251. Mr. Santana was involved in a physical altercation ove the

use of the telephone.

252. He received a disciplinary ticket for fighting. He went to Segregation and received thirty (30) days of C grade.

253. However, when Mr. Santana was released from C grade he was allowed to return to the Lewis program.

254. Mr. Santana was found guilty of a physical altercation, his ticket was not expunged, and he was not kicked out of the Lewis program or Sheridan C.C.

255. Plaintiff was treated differently than Mr. Santana. They both received disciplinary tickets, time in segregation, and C grade. Only plaintiff was transferred out of Sheridan, despite the fact that his ticket was expunged, and Mr. Santana was allowed to stay and continue his education.

256. The other inmate plaintiff met was an older white man named Tom. Upon information and belief, he lived in C26 cell 15.

257. Tom killed his previous cellmate (years before) and was allowed to be a resident at Sheridan C.C. And he was housed in a single cell.

258. Plaintiff was treated differently than Tom. Both caused the death of their cellmates. Yet, Tom was allowed to stay at Sheridan C.C. and plaintiff was transferred out.

259. Plaintiff sent out numerous letter regarding his treatment while at Sheridan C.C.

260. Plaintiff wrote defendant Woods on or about September 21, 2024, and October 27, 2024.

261. Plaintiff sent the October letter as certified mail.

262. Plaintiff wrote defendant Hughes on September 21, 2024, and on October 8, 2024.

263. Plaintiff sent the October letter as certified mail (Ex. complaint #14, 14A, 14B, 14C, 14D).

264. Plaintiff wrote defendant Pontwood on September 21, 2024 and on October 20, 2024.

265. Plaintiff sent the October letter as certified mail.

266. Plaintiff wrote both the Chicago and Springfield offices of the Illinois Attorney Generals Office on October 21, 2024.

267. Plaintiff used blank white envelopes and used a money voucher to pay for the postage using his trust fund account.

268. Plaintiff used money vouchers and certified mail so he would have receipts that the letters were mailed.

269. In all of the letters plaintiff sent, he explained in detail what had occurred since he had arrived at Sheridan.

270. He explained what led up to him receiving the ticket on September 11, 2024.

271. He explained that he was found guilty and the discipline

he received.

272. He expressed his concerns that he would be removed from NPEP.

273. He asked each defendant to look into his situation and intervene on his behalf.

274. None of his letters were responded to.

275. Plaintiff has an extensive history of using money vouchers to pay for postage and to send letters via certified Mail.

276. Plaintiff has always received receipts for these and they've always been documented on his trust fund balances before he went to Sheridan.

277. Upon information and belief, Defendant Martin, the Mail room supervisor, did not allow several of plaintiffs legal mail and priviledged letters to go out.

278. Plaintiff never received a money voucher receipt for the two letters he mail to the Attorney Generals offices and there was no debit on his trust fund account.

279. Plaintiff never received the money voucher receipt or the USPS certified mail receipt for the letter he sent to defendants Woods or Pontwood, and there was no debit for them on his trust fund account.

280. Plaintiff received both of these receipts for the letter he sent to defendant Hughes (Ex Complaint # 14, 14A).

281. Plaintiff reviewed his trust fund report for September and October 2024, and did not see any payments made for postage for these letters and dates.

282. Upon information and belief, Defendant Martin did not send out some of plaintiff's legal and priviledged mail.

283. Plaintiff filed numerous grievances regarding his treatment while at Sheridan. The ticket he received, the disciplinary transfer, and the loss of NPEP.

284 Plaintiff had to file the majority of his grievances directly to the ARB per policy.

285. Defendant Nothnagle (ARB Member) refused to address the majority of plaintiff's grievances. He returned many of the grievances without reviewing them.

286. Grievance # 10240168 was a grievance plaintiff filed at Sheridan regarding his false disciplinary report.

287 This grievance was affirmed by Sheridan grievance officer and the ticket was expunged. Defendant Nothnagle and Defendant Hughes denied it when the ARB reviewed it (Ex Complaint #12, 15).

288. Despite the grievance being affirmed by Sheridan defendant Nothnagle failed to address plaintiff's ongoing issues or relief requested.

289. Plaintiff requested not to be transferred out of Sheridan to be allowed to return to NPEP, and to be reimbursed

money he lost on Subscriptions fees as a result of being in segregation and C grade.

290. Plaintiff wrote grievances about Defendants Nothnagle and Hugheses lack of responses and also sent defendant Nothnagle a letter explaining all the issues plaintiff had, why his grievances were all different, and requested that his unreviewed grievances be reviewed and responded to.

291. The grievances were never reviewed and defendant Nothnagle did not respond to plaintiff's letter.

292. Plaintiff's Due Process rights were violated despite the false disciplinary ticket being expunged.

293. Plaintiff was disciplined after the ticket was expunged. He had to do thirty (30) days on B grade. He was transferred out of Sheridan. And he was not allowed to return to NPEP.

294. Before plaintiff went to Sheridan he only had two disciplinary violations on his record (Ex. complaint #03).

295. While plaintiff was at Sheridan his total number of disciplinary violations went from two to three (Ex. complaint #08).

296. Once plaintiff left Sheridan his total number of disciplinary violations went back down to two (Ex. Complaint #16).

297. upon information and belief, Once an inmate is enrolled in college courses it puts a hold on them transferring to allow

them to finish their program

298 upon information and belief, Defendant Woods had his staff write plaintiff the false ticket and find him guilty to give defendant Woods an "excuse" to remove plaintiff from NPEP and kick him out of Sheridan C.C.

299 If defendant Woods, as Warden, had the authority to have plaintiff transferred out of Sheridan C.C. just because he didn't want him there, then he would not have needed to find plaintiff guilty of a disciplinary violation to justify transferring him out of Sheridan C.C.

300. The actions by defendants Woods, Martin, Booker, Latigo, Carlock, and Petty were malicious and intentional. They caused plaintiff to be unjustly disciplined and to be removed from the Northwestern Prison Education Program. An incredible opportunity for plaintiff to better himself with an education as well as increasing his chances of success upon re-entry back into society.

301. Defendants intentional actions caused, and are still causing, plaintiff anxiety, stress, and depression.

302 Plaintiff had to spend five (5) days (9/12-9/17/24) on crisis watch due to the anxiety and depression caused once he was made aware that he received a ticket and could potentially be removed from NPEP.

303. Then, upon being informed that he was actually being transferred out of Sheridan C.C. and losing the opportunity to receive an education from Northwestern University, his

emotions overwhelmed him and caused him to attempt Suicide by cutting his wrist.

304 Plaintiff filed a grievance directly to the ARB dated December 19, 2024. In this grievance he explains that the disciplinary ticket that caused him to be removed from NPEP and transferred out of Sheridan C.C. was expunged before he was transferred.

305. As relief plaintiff requested to be allowed to re-enroll in NPEP and returned to Sheridan C.C.

306. This grievance was denied by defendants Nothnagle and Hughes.

307. The reason given for denial was, "This office reached out to Sheridan C.C. and was advised grievant does not meet the qualifications for NPEP. - Denied" (Ex. Complaint #18).

308. This grievance was denied after all of plaintiff's other grievances on this issue were denied and after defendants Nothnagle and Hughes received plaintiff's letters explaining all of the events that led up to him receiving the disciplinary ticket.

309. These defendants were aware that plaintiff was just accepted into NPEP and transferred to Sheridan because of NPEP.

310. Defendant Nothnagle's response does not note the qualifications Sheridan C.C. claims are needed to be accepted into NPEP.

311. Plaintiff met the qualifications in September 2024, (only six month previous) and was accepted into NPEP. What changed?

312. Upon information and belief, the qualifications to be

accepted into NPEP have not changed. The only thing that has changed since plaintiff was accepted is that defendant Woods became aware of plaintiff's expunged file.

313. Upon information and belief, there are currently students/inmates enrolled in NPEP (and living at Sheridan) that are convicted murderers and are serving life sentences.

314. Plaintiff Mayfield is neither of these.

315. Plaintiff is being denied the opportunity to return to Sheridan C.C. to participate in NPEP without justification or reasoning.

316. Defendant Nothnagle did not properly investigate plaintiff's December 19, 2024, grievance. He contacted Sheridan and when they said plaintiff was not qualified for NPEP he just took them at their word. He did not find out why plaintiff was no longer qualified. He just took the word of the people who just retaliated against plaintiff by kicking him out of Sheridan C.C.

317. Plaintiff is not being allowed to return to Sheridan C.C. to participate in NPEP not because he doesn't meet the requirements. Not because of a negative disciplinary record. Not because he violated any rules.

318. Plaintiff is not being allowed to return to NPEP because defendant Woods, backed by defendant Hughes, does not want plaintiff Mayfield at Sheridan C.C.

319. There has been no valid reason given as to why plaintiff can not return to Sheridan C.C. to participate in NPEP.

to receive the education and degree he applied to, was accepted into, and was transferred to.

320. Defendant Woods and/or Defendant Hughes could have intervened at any point to stop the ongoing discipline and eventual transfer of plaintiff, but they did not. Allowing him to Suffer mentally. Plaintiff continues his mental suffering hoping everyday that he will be allowed to return to Sheridan C.C. and participate in NPEP.

321. Plaintiff has properly exhausted all claims and all defendants (Ex Complaint # 12-12E, 15).

VI Legal claims

Count 1

322 Plaintiff's protected speech was a motivating factor in the intentional fabricating, the conspiring to retaliate by writing a false disciplinary report, and the placing of plaintiff in Segregation as a result of the false disciplinary report — with the intent of having plaintiff transferred out of Sheridan C.C. — by defendants Woods, Martin, Booker, and Latigo violated plaintiff Calvin Mayfield's rights and constituted retaliation under the First Amendment to the United States Constitution.

Count 2

323 The fabricating, the conspiring to fabricate a false disciplinary report with the intent of having plaintiff transferred out of Sheridan C.C., and the placing of plaintiff in Segregation as a result of the false disciplinary report was orchistrated against plaintiff as an act of discrimination because the defendants found

out that he had caused the death of his cellmate. Defendants Woods, Booker, Martin, and Latigo treated plaintiff differently than others similarly situated as him, and violated plaintiff Calvin Mayfield's rights as a class of one and constituted an Equal protection claim under the Fourteenth Amendment to the United States Constitution.

## Count 3

324 Plaintiff's protected Speech was the motivating factor which lead to defendants Woods, Carlock, and Petty Conspiring to retaliate against plaintiff by: finding him guilty of a false disciplinary violation with the sole intention of having plaintiff transferred out of Sheridan C.C. Finding plaintiff guilty of a disciplinary violation based on a fabricated report in which none of the offenses alleged were Substantiated. And disciplining plaintiff with Seven (7) days of Segregation, thirty (30) days of C grade, thirty (30) days of B grade, removal from NPEP, and a disciplinary transfer violated plaintiff Calvin Mayfield's rights, and constituted Retaliation under the First Amendment to the united states Constitution.

## Count 4

325 The Conspiring to find plaintiff guilty and the finding of plaintiff guilty of unsubstantiated offenses with the malicious intent of having plaintiff Sent to Segregation so that he would later be transferred out of Sheridan C.C., disciplining him with Seven (7) days in Segregation, thirty (30) days of C grade, thirty (30) days of B grade, removal from NPEP,

and a disciplinary transfer to Pinckneyville C.C. was orchistrated against plaintiff as an act of discrimination because the defendants found out that Plaintiff had caused the death of his cellmate. Defendants Woods, Carlock, and Petty treated plaintiff differently than others similarly situated and violated Plaintiff Calvin Mayfield's rights as a class of one, and constituted an Equal protection claim under the Fourteenth Amendment to the United States Constitution.

Count 5

326. The finding of plaintiff guilty of false disciplinary violations, the subsequent discipline of seven (7) days of segregation, thirty (30) days of C grade, removal from NPEP, thirty (30) days of B grade, a disciplinary transfer, and the continued denial to return plaintiff to Sheridan to participate in NPEP - all after the grievance was affirmed and the ticket expunged - was done without any substantiated evidence of the alleged offenses committed. Defendants Woods, Carlock, and Petty violated plaintiff Calvin Mayfield's rights and constituted a Due Process violation under the Fourteenth Amendment to the United States Constitution.

Count 6

327 Allowing plaintiff to be removed from NPEP and transferred out of Sheridan, after the disciplinary ticket was expunged, despite defendants Hughes and Pontwood having firsthand knowledge after plaintiff informed them both of the events that had transpired and requested that they intervene and assist him. Their refusal to step in and use their authority to right the wrongs done violated plaintiff

Calvin Mayfield's rights and constituted a Due process violation under the Fourteenth Amendment to the United States Constitution.

## Count 7

328 After plaintiff's grievance was affirmed and the disciplinary ticket was expunged, defendant Woods waited five (5) days (until after plaintiff was transferred) to concur and sign the grievance officers response. Defendant Woods intentional delay in signing the grievance officers response allowed plaintiff to be disciplinary transferred out of Sheridan. Defendant Woods intentional delay of processing the grievance officers response also forced plaintiff to serve out the remainder of his B grade discipline (forty-four (44) days after the ticket was expunged). These acts violated plaintiff Calvin Mayfield's rights and constituted a due process violation under the Fourteenth Amendment to the United States Constitution.

## Count 8

329. Defendant Escamilla only did a "deep dig" into plaintiff's expunged file. Not any of the other NPEP students, Thus treating plaintiff differently. Defendant Escamilla divulged plaintiff's expunged disciplinary information to defendant Woods so it could be used against plaintiff to have him disciplinary transferred out of Sheridan. These acts by defendant Escamilla violated plaintiff Calvin Mayfield's rights and constituted a due process violation and Equal protection claim under the Fourteenth Amendment to the United States Constitution.

## Count 9

330. The denial of Plaintiff's grievance #10240168 after it was affirmed by Sheridan, the refusal to reimburse money owed to Plaintiff after grievance #10240168 was affirmed by Sheridan, the refusal to return plaintiff back to Sheridan C.C. after grievance #10240168 was affirmed by Sheridan C.C. and the ticket was expunged. The refusal to review and respond to plaintiff's numerous grievances related to his treatment and disciplinary transfer out of Sheridan C.C — despite plaintiff writing both defendants explaining these issues and requesting that they be addressed. These inactions by defendants Hughes and Nothnagle violated plaintiff Calvin Mayfield's rights and constituted a Due process violation claim under the Fourteenth Amendment to the United States Constitution.

## Count 10

331. The deliberate and intentional acts by defendant D. Martin of not mailing out four(4) of plaintiff's legal priviledged mail that was properly placed in the institutional mailbox with proper postage paid violated plaintiff Calvin Mayfield's rights and constituted a Freedom of Speech Claim under the First Amendment to the United States Constitution.

## Count 11

332. The intentional fabricating, the conspiring to retaliate by fabricating a false disciplinary report with the intent of sending plaintiff to segregation, C grade, and a disciplinary transfer out of Sheridan C.C. The restraining

and placing plaintiff in Segregation as a result of the fabricated disciplinary report—despite a lack of substantiated evidence – by defendants Woods, Martin, Booker, and Latigo violated plaintiff Calvin Mayfield's rights and constituted a State Claim of False Imprisonment.

## Count 12

333 The conspiring to find plaintiff guilty of a fabricated disciplinary report based on unsubstantiated offenses, which would later be expunged, and the actual finding of guilty was done with the Malicious intent of taking away plaintiff's freedoms by having him placed in Segregation, demoted from A grade, and transferring him out of Sheridan by defendants Woods, Carlock, and petty violated plaintiff Calvin Mayfield's rights and constituted a state claim of False Imprisonment.

## Count 13

334. The conspiring to fabricate, the fabricating, the finding of guilty with out any investigation or with out any probable cause or evidence to substantiate the alleged offenses, was done with malice by defendants Woods, Martin, Booker, Latigo, Carlock, and Petty with the sole intent of having plaintiff removed from NPEP and transferred out of Sheridan C.C. violated plaintiff Calvin Mayfield's rights and constituted a state claim of Malicious Prosecution.

## Count 14

335. The wilful act of fabricating and misusing a

disciplinary report to initiate a disciplinary hearing – which was used for the ulterior purpose, or objective, of transferring plaintiff out of Sheridan C.C – not what it was designed for. Defendant Woods, Martin, Booker, Latigo, Carlock, and Petty violated plaintiff Calvin Mayfield's rights and constituted a state Claim of Abuse of Process.

Count 15

336. Defendants Woods, Martin, Booker, and Latigo conspired to knowingly fabricate a false disciplinary report and knowingly wrote a false disciplinary report written with the intent to mislead. This violated plaintiff Calvin Mayfield's rights and constituted a State Claim of Deceit.

Count 16

337. Defendants Woods, Martin, Booker, and Latigo conspired to knowingly fabricate a false disciplinary report and wrote a fabricated and false disciplinary report with the intent to cause harm to the plaintiff's reputation in a negative manner. These acts violated plaintiff Calvin Mayfield's rights and constituted a State Claim of Defamation.

Count 17

338. The conspiring to fabricate a false disciplinary report, the writing of the false report, and the vouching that the information in the report was accurate in disregard of the high probability that it would cause harm to plaintiff, by Defendants Woods, Martin, Booker, and Latigo, violated Plaintiff

Calvin Mayfield's rights and Constituted a State Claim of Willful and Wanton misconduct.

## Count 18

339. The Conspiring to find plaintiff guilty, the finding of plaintiff guilty, and the administering of excessive discipline — all done without any investigation or without any probable cause or evidence to substantiate the alleged offenses — in disregard of the high probability that these actions would cause harm to plaintiff in the form of: Segregation, demotion of grade, removal from NPEP, and a disciplinary transfer. These acts violated plaintiff Calvin Mayfield's rights and constituted a state claim of Willful and Wanton misconduct.

## Count 19

340. The Conspiring to fabricate a false disciplinary report, the writing of the false disciplinary report, and the vouching for the accuracy of the false disciplinary report was all done with the malicious intent of Sending plaintiff to Segregation so he could then be transferred out of Sheridan C.C. These acts done by defendants Woods, Martin, Booker, and Latigo Caused plaintiff to become emotionally distressed and had to Spend five (5) days on Crisis watch (9/12-9/17/24), and would later cause him to attempt Suicide. These acts by defendants violated plaintiff Calvin Mayfield's rights and constituted a State claim of Intentional Infliction of Mental Distress.

Count 20

341 The Conspiring to find plaintiff guilty, the finding of plaintiff guilty, and the administering of excessive discipline without an investigation, probable cause, or evidence to substantiate the alleged offenses was done Maliciously with the intent of sending plaintiff to Segregation to later transfer him out of Sheridan C.C. These acts committed by defendants Woods, Carlock, and Petty caused plaintiff to become emotionally distressed and attempt suicide. These acts by defendants violated plaintiff Calvin Mayfield's rights and constituted a State claim of Intentional Infliction of Mental Distress.

Count 21

342 The conspiring to fabricate a false disciplinary report, the writing of the false disciplinary report, and the vouching for the accuracy of the false disciplinary report was all done done with the Malicious intent of sending plaintiff to segregation so he could then be transfered out of Sheridan C.C. These acts done by defendants Woods, Martin, Booker, and Latigo caused plaintiff to become emotionally distressed and have to spend five (5) days on crisis watch (9/12-9/17/24), and would later cause him to attempt suicide. These acts by defendants violated plaintiff Calvin Mayfield's rights and constituted a state claim of Negligent Infliction of mental Distress.

Count 22

343 The conspiring to find plaintiff guilty, the finding of plaintiff guilty, and the administering of excessive

discipline without an investigation, probable cause, or evidence to substantiate the alleged offenses was done maliciously with the intent of sending plaintiff to segregation so he could later be transferred out of Sheridan C.C. These acts committed by defendants Woods, Carlock, and Petty caused plaintiff to become emotionally distressed and attempt suicide. These acts by defendants violated plaintiff Calvin Mayfield's rights and constituted a State Claim of Negligent Infliction of Mental Distress.

## Count 23

344. on August 30, 2024, Plaintiff signed his letter of confirmation that he was accepting his invitation to be enrolled in NPEP. By signing this document plaintiff entered into a contract with NPEP and the IDOC. This contract would guarantee that as long as plaintiff followed all rules and regulations he would be allowed to participate in NPEP until he graduated. Defendants Woods, Martin, Booker, Latigo, Carlock, and pettys intentional actions of conspiring to fabricate a false disciplinary report, writing a false disciplinary report, vouching for the accuracy of the events in the false report, conspiring to find plaintiff guilty, finding plaintiff guilty, and recommending and administering excessive discipline that would have plaintiff removed from NPEP. This was all done for the purpose of having plaintiff transferred out of Sheridan C.C. These purposeful acts interferred with plaintiff's ability to complete the contract. This violated plaintiff Calvin Mayfield's rights and constituted a state claim of Intentional Interference with a contract.

## Count 24

345. Defendant Dave Martin not mailing out four (4) of plaintiff's legal/priviledged letters that plaintiff properly placed in the institutional mail box, with proper postage paid, violated plaintiff Calvin Mayfield's rights and constituted a state claim of willfil and wanton misconduct.

346. The plaintiff has no plain, adequate, or complete remedy at law to redress the wrongs described herein. Plaintiff has been and will continue to be irreparably injured by the conduct of the defendants unless this court grants the declatory annd injunctive relief which plaintiff seeks.

## VII Prayer FOR Relief.

WHEREFORE, plaintiff respectfully prays that this court enter judgement granting Plaintiff:

347 A declaration that the acts and omissions described herein violated plaintiff's rights under the Constitution and laws of the united states and State of Illinois.

348. A preliminary and permanent injunction ordering defendants Hugles and Woods to stop blocking plaintiff access to NPEP and allow him to return to Shendon C.C. for the start of the 2025 school year.

349. Compensatory damages in the amount equal to the cost of a bachelors degree from Northwestern University. Compensatory damages for the loss of future income earning potential that would have resulted from a degree from Northwestern. Against each defendant, jointly and

Severally.

350. Punitive damages against each defendant.

351. A jury trial on all issues triable by jury

352. Plaintiff's costs in this suit.

353. Allow Plaintiff to return to Sheridan C.C. to participate in the NorthWestern. Prison Education program through its completion.

354 Any additional relief this court deems just, proper, and equitable.

Dated: March 30, 2025

Respectfully Submitted,

Calvin Mayfield M31586
Pinckneyville C.C.
5835 State Route 154
Pinckneyville, IL 62274

VERIFICATION

I have read the foregoing complaint and hereby verify that the matters alleged therein are true, except as to matters alleged on information and belief, and, as to those, I believe them to be true. I certify under penalty of perjury that the foregoing is true and correct.

Executed at Pinckneyville IL on March 30, 2025.

Calvin Mayfield M31586

United States District Court
Northern District of Illinois

Calvin Mayfield |
Plaintiff |
v. | No.
Ryan Woods, et al., |
Defendants |

Scanned at Pinckneyville CC and e-mailed 4/17/25 by CB (Initials) 1 (No.) pages

Certificate of Service

I hereby certify that on April, 17 2025, I electronically filed the foregoing Complaint, order to show cause, Declaration, Memorandum of law in support of plaintiff's Motion for a Temporary restraining order and Preliminary Injunction with the clerk of the Court using the CM/ECF System. The electronic case filing system sent a "Notice of E-Filing" to the following:

NONE

under penalties as provided by law, I certify that the statements set forth herein are true and correct.

Calvin Mayfield M31586

Scanned at Pinckneyville CC and e-mailed
4/17/25 by QB 41 pages
Date initials No.

RECEIVED BY
SEP 04 2020
Western IL Corr. Center
Health Care Unit

WESTERN ILLINOIS CORRECTIONAL CENTER

Sick Call Request Slip

Housing Unit 4-A-28 Date Sept 2 2020

Name Quincy Ivory ID# R28290

Request to see: Medical____ Dental____ Med Refill/Renewal____

Optometry____ Mental Health ✓

Reason for Request: I Have Anti Scchole Disorder I don't

MUST WRITE REASON/MEDICATION

Supposed To Be In a room with another Inmate → He Could get Hurt

Date/Time Received__________ Call pass entered? Yes No RN Initials__________

Date/Time Seen__________ RN Initials__________

NSC Refused____ Follow-up Needed? Yes No Referred to__________

PLACE IN MED REFILL BOX - WILL BE PICKED UP BY NURSING STAFF AT 3 PM DAILY

ITP needed

9/24/2020 TT

MDT 9/4/2020 TT no note

Attachment 6
page 4 of 5

Ex complaint #011

2024–2025 APPLICATION FOR THE

# Northwestern | PRISON EDUCATION PROGRAM

## PROGRAM DESCRIPTION:

The Northwestern Prison Education Program (NPEP) is a partnership between Northwestern University, the Illinois Department of Corrections (IDOC), and Oakton College to provide a comprehensive liberal arts education to students at Sheridan Correctional Center.

NPEP is open to applicants from all IDOC facilities who have either earned a high school diploma or passed the GED, with the exception of those who are subject to IDOC restrictions. Students are accepted into NPEP by an admissions committee made up of Northwestern administrators, faculty members, and graduate students. The admissions process is rigorous and selective, with applications to NPEP including personal essays, textual analysis, documentation of high school diploma or GED, and in-person interviews. Each NPEP cohort is limited to approximately 20 students.

Students accepted into NPEP will take a minimum of 2–3 courses per quarter for 3–4 quarters during each year. Course credits will be granted by Northwestern's School of Professional Studies and Oakton College, culminating in an Associate of General Studies conferred by Oakton Community College typically within three years of admission. Students will then be eligible to apply to Northwestern University for a Bachelor of Science degree with a major in social sciences from Northwestern's School of Professional Studies.

## APPLICANTS FOR THE NORTHWESTERN PRISON EDUCATION PROGRAM SHOULD:

- Be at least 18 years of age
- Have fewer than 15 years remaining on the current period of incarceration (or request an exception on the application)
- Be enrolled in only one degree-seeking program at a time
- Have earned a high school diploma or equivalent
- Have at least 12 months of infraction-free behavior (Offender Discipline Level 300 or 400 infractions only; may be waived by facility warden)
- Attend all required classes (2–5 classes weekly) throughout approximately 4–5 years to complete the Bachelor of Science degree
- Be aware that NPEP coursework and NPEP commitments must take precedence over other commitments
- Be a resident at an Illinois Department of Corrections facility that has been chosen to participate in NPEP
- Submit a full application for admission to the Bachelor of Science degree program in Northwestern's School of Professional Studies after completing the Oakton College Associate of General Studies degree

There are no restrictions as to age, race, veteran status, national or ethnic origin, sexual orientation, religious or political affiliation. All qualified applicants will be considered for NPEP.

Ex Complaint #02

Copy Back →

## ADMISSIONS PROCESS:

1. The application form, statement of purpose, textual analysis, and copy of a GED or High School Transcripts must be submitted to the EFA's office **by April 15, 2024.**
2. Applications will be screened for meeting the minimum NPEP acceptance requirements/prerequisites. All applications that meet the baseline requirements will be screened by IDOC.
3. The NPEP Admissions Committee will review all complete applications that meet the criteria of the two-step screening process and identify a list of top applicants.
4. The NPEP Admissions Committee will conduct in-person interviews with the top applicants.
5. The NPEP Director will provide a final list of 20 selected applicants along with wait-listed applicants to the Illinois Department of Corrections. NPEP will notify all applicants as to whether they have been accepted, waitlisted, or not accepted. Unsuccessful candidates may reapply the following application cycle. IDOC will secure academic records (including HS diploma or GED), access permission, and written formal acceptance confirmation from the successful applicants. Candidates not confirming enrollment within a 2-week period of notification will be replaced by wait-listed candidates.
6. Once accepted and confirmed, students will be enrolled in Fall 2024 classes. Prior to the start of Fall 2024 classes, students not already at Sheridan Correctional Center will be transferred to Sheridan Correctional Center. Orientation for incoming students will be in September 2024 at Sheridan Correctional Center.

Ex. Complaint # 02A

# State of Illinois -- Department of Corrections Disciplinary Tracking Inmate Disciplinary Card

**Name:** MAYFIELD, CALVIN **IDOC # :**M31586

**Transferred In:** 2021-09-14 **Disciplinary History from 1/1/1998 through 9/25/2023** **Living Unit:** PNK/R2/C /59

| Incident Date<br>Incident/Summ#/Inst.<br>Ticket Type | Offense Codes, Descriptions | | Disciplinary Action |
|---|---|---|---|
| 3/31/2017<br>201701341/1-STA<br>Major | 210 Impairment Of Surveillance<br>308 Contraband/Unauthorized Property | Guilty<br>Not Guilty | Verbal Reprimand |
| 10/14/2019<br>201901832/1-WIL<br>Major | 202 Damage Or Misuse of Property<br>Comments: burnt up outlet/ using a stinger<br>308 Contraband/Unauthorized Property<br>Comments: stinger/ altered tv | Guilty<br><br>Guilty | 1 Months B Grade/Level |

Ex. Complaint #03

# Northwestern
PRISON EDUCATION PROGRAM

405 Church Street
Evanston, IL 60201

npep@northwestern.edu
https://sites.northwestern.edu/npep
847.491.2557

August 19, 2024

Mr. Calvin Mayfield, M31586
Pinckneyville Correctional Center

Dear Mr. Mayfield:

Congratulations on your admission to the Northwestern Prison Education Program (NPEP)! We received applications for this program from many applicants across the state of Illinois, and you are one of a very small percentage selected for admission. You should take tremendous pride in this accomplishment!

NPEP is an interdisciplinary program of study that offers a full undergraduate liberal arts curriculum to students at Sheridan Correctional Center. You will be enrolled in courses through Northwestern University's School of Professional Studies (SPS), and the faculty in this program represent schools and departments from across the University. As you will discover, the faculty share a commitment to bringing a first-rate educational experience to the students in NPEP.

The courses you will take in NPEP are credit-bearing and are taught with content and expectations equivalent to those on Northwestern's Evanston and Chicago campuses. NPEP is on the quarter system, and we anticipate offering 2–3 courses to students during each of the quarters of the academic year (Fall, Winter, Spring, and Summer). Courses taken with NPEP build toward an associate degree awarded by Oakton College. In the last quarter of the associate's program, you will be invited to apply for admission to Northwestern University's Bachelor of Science in General Studies program.

All NPEP courses will be offered in person at Sheridan Correctional Center in Sheridan, IL. NPEP students will be expected to follow all of the policies and procedures of both Northwestern University and Sheridan Correctional Center. Students are expected to attend all classes and to come to class meetings prepared, having done all required readings and work. Students are also expected to abide by Northwestern University's student code of conduct while enrolled in NPEP.

Northwestern University fully funds this program. Currently, NPEP will waive your tuition fees and will cover the costs of all of your course materials, including academic supplies and textbooks.

Official high school transcripts with conferred date of completion (or GED) are required for NPEP program admission, and SPS will oversee the procurement of these documents. The Fall 2024 term begins the week of September 24th, 2024. Please let us know in writing on the attached form no later than Friday, August 23rd whether you accept NPEP's offer of admission.

Ex complaint # 04

https://www.chicagomag.com/chicago-magazine/april-2024/welcome-to-northwestern-university-at-stateville/



William Peeples graduated from Northwestern last fall — while serving a life sentence.

Group A

**Welcome to Northwestern University at Stateville**

Inside this maximum security prison, a groundbreaking program offers inmates the chance to earn a degree from one of the country's top schools. Some will never leave these walls. Here's why it still matters.

BY BRYAN SMITH
PHOTOGRAPHY BY ALEX GARCIA
**MARCH 26, 2024, 6:00 AM**

**RELATED:** "Cleaning Is Something I Can Do"

William Peeples was an invisible man. He did not know when exactly he'd come to think of himself this way. But after 27 years in prison — 13 of them on death row before his sentence was commuted — he had accepted it as true.

That's how Peeples felt one morning in 2017 while he swept the chapel at Stateville Correctional Center. As one might expect at a state prison, it's a chapel in name only. No stained-glass windows, no altar, no weeping Jesus gazing down from a wall-mounted crucifix. Just a few small rooms off a narrow hallway. Ring three times at the steel gate and wait for it to be unlocked, then walk past the laundry (two rings if that's where you're headed), with its row of churning industrial washers and dryers and its sharp tang of bleach, and into the chaplain's office. There, the Reverend George Adamson, a somewhat eccentric presence with his long hair and penchant for motorcycles and a stint as musical director for the Platters, greets you from behind his large desk.

On this day, Peeples, push broom in hand, glanced up to see a visitor, a woman — a university professor. She was talking fast and excitedly to the chaplain, which, Peeples would later learn, is how she speaks to virtually everyone, always. Peeples had heard some inmates talking about her, about how she was a real-life Northwestern University faculty member teaching legit classes on philosophy and the law inside the prison.

Peeples was interested in taking her class, but he was nervous asking her about it. So, he was relieved when the professor, Jennifer Lackey, offered him a bright "Good morning" and extended her hand.

"You're the person I've been hearing about," Peeples said. "The professor. I want to take your law ethics class."

"That's great," she responded. "Unfortunately, we're already two weeks in and the class is full. Maybe the next one."

"No," he said. "I need to be in this one. Please."

Lackey paused. The inmate seemed so hungry and earnest.

"OK," she said. "What if I get you all the readings — there are six. Can you do a paper on each by the next class? It's in one week."

"Yes," he replied without hesitation.

"All right. Get them to me and I'll see what I can do."

No one in the office that day — not Lackey, or Adamson, or Peeples — had any idea what would happen in time: that Peeples would become one of Lackey's best students and that her classes would evolve into a history-making endeavor that would ensure Peeples and all the other inmates involved were never invisible again.

The tomb-gray slabs that form the walls of Stateville, a maximum security state prison in Crest Hill, about 40 miles southwest of Chicago, loom out of the flatlands like a low line of brooding storm clouds. The guard towers weep rust, and large dark blotches mar the 33-foot-high walls — a fitting reflection of the grim history that has played out behind them. The serial killer John Wayne Gacy was put to death here in 1994 by lethal injection, spared the prison's previous method of execution: Old Sparky, the electric chair. Richard Speck, who slaughtered eight nursing students in Chicago in 1966, served his sentence here. Leopold and Loeb, the University of Chicago students who famously kidnapped and murdered a 14-year-old boy in 1924 to try to prove they could get away with it, also did time here, as did Larry Hoover, who founded Chicago's Gangster Disciples.

Even the architecture of the prison, which opened in 1925, is notorious. At the center of its labyrinthine campus stands F House, a circular building where hundreds of inmates once lived in cells stacked around a tower from which a single guard could peer into each one. This panopticon model was adopted in numerous prisons for its efficiency, but all such buildings in the United States, including Stateville's, were eventually shuttered after criticism that the design created "insufferable noise-levels; extreme temperatures and poor ventilation," in the words of the John Howard Association, an Illinois organization dedicated to criminal justice reform.

One Wednesday morning last November, eight days before Thanksgiving, the ghosts and gloom of the old prison were temporarily chased away, supplanted by an air of something as rare as silence in a cellblock: celebration. In the prison's auditorium, 16 inmates in full graduation regalia, tassels swinging from their mortarboards, took their seats among family members and the media, the first graduating class of the Northwestern Prison Education Program and the first students in history to earn a bachelor's from a top 10 American university while behind bars.

They listened as the commencement speaker, celebrated author Ta-Nehisi Coates, praised their achievement and shared his sense of connection with them. "When I got the invitation to come here to address you, wild horses couldn't stop me," he said, "because I'm addressing myself." The graduates, including William

Peeples, strode across the stage in turn, shook hands with Lackey and Coates, and took their diplomas in hand.

It was a scene that could have taken place on Evanston's leafy campus. Except for the reminders that it wasn't. Watching from every corner, at every door, from perches on each side of the stage, and from a balcony at the rear of the auditorium were armed guards, some chewing gum, some wearing sunglasses. And after the ceremony, when the cameras had left and the families had been escorted back outside, the inmates were aggressively searched and had their cells tossed.



Jennifer Lackey, founding director of the Northwestern Prison Education Program

Ivisited Stateville in early January to sit in on a Northwestern class. When I arrived at the visitors' entrance, a clean but drab room with fluorescent lights and a long list of rules posted in English and Spanish, I spotted Lackey, who would be leading me in. She was unmistakable — there or anywhere. A 5-foot-5 bundle of energy, earnestness, and fierceness, the 51-year-old professor is a hurricane blowing through the university and the prison. Between the prison program and her full-time job teaching philosophy to undergrads in Evanston, 80-hour workweeks are not unheard of for her. On this day, she was coordinating movements like a field marshal mounting a charge, chatting easily with an intake sergeant, helping a group of students and teaching assistants get signed in, greeting the professors, and making sure everyone's papers and assignments were tucked into plastic bags as required.

After being searched, we were led by guards down a sidewalk to the prison entrance. One after another, steel gates banged shut behind us as we passed several checkpoints under the tight gaze of correctional officers. At each gate, their shouted instructions echoed down the sterile, polished-concrete hallways. We emerged through a solid steel door into the squintingly bright sunlight and walked across the prison yard, where a number of inmates who had been exercising stopped to watch us pass.

Entering the education building, we were shown to the program's main classroom, aptly called the Purple Room. Its doorway, painted Wildcat purple, is a singular splash of color in the industrial gray hallway. The school's color also accents a long iron girder overhead, the trim of the classroom's interior windows, and the lower half of one of its walls. The Northwestern Prison Education Program seal is prominently stenciled on another.

Lackey launched the program in 2018, three years after starting to teach at Stateville and three years before the endeavor would be given degree-granting status. Originally, the students were meant to live together in a single college-dorm-like cell house, but a roof collapse prevented that from happening, leaving them scattered in different locations. The Purple Room was soon created, upgraded from a room that had previously been unusable, a de facto trash dump condemned by wall-climbing mold.

**The lighting is poor. Cardboard boxes propped on laps serve as writing desks. Traditional pens are forbidden because the hard plastic can be fashioned into shivs.**

By ones and twos, the student inmates — dressed in powder blue prison shirts and navy blue prison pants and sporting wool hats or kufi caps, beards, braids, tattoo sleeves, and neck tattoos that seemed incongruous with the reading glasses many wore — drifted in beneath a set of pipes that rattled like a bucket boy banging out a solo on a downtown street corner.

At just past the hour, the professor arrived. Slightly rumpled in a maroon sweater and chinos, his dark beard fighting to hold off an encroachment of silver, David Smith is a Mr. Chips stereotype. He teaches Statistical Methods of Psychology, which, he is well aware, isn't a favorite subject of most of his student inmates, who tend to prefer explorations of philosophy and sociology to the cold language of binomial distributions and standard deviations. So, to grab the class's attention, he employs sports analogies.

That day, he introduced one statistical method as a means of settling a timeless argument: Who was better, Michael Jordan or Kareem Abdul-Jabbar? Smith guided the class through the formula, with inmates peppering him with a range of questions, some on point, others not so much: "Can you do that last part again?" "Is that the same thing as the P values?" "Have you taught Jeff Bezos's daughter? I heard she's at Northwestern."

The discussion culminated in a genuine eureka moment. "Yes!" an inmate named Miguelangel Garcia shouted, grinning. "You've just given me a way to prove Michael Jordan is the best of all time."

It was Lackey's goal for the Purple Room to mimic other Northwestern classrooms as closely as possible, important enough to her to spend grant money acquiring the same desks as those on the Evanston campus. Likewise, course offerings are many and varied — psychology, chemistry, journalism, statistics, sociology, physics, legal writing and advocacy, philosophy (Philosophy of Punishment and Incarceration is a favorite), archaeology, documentary filmmaking, and dozens of others.

The logistics of creating and maintaining a program like this would be daunting in any off-campus setting, but a place like Stateville adds layers of complexity. The syllabuses for all classes must be approved by prison officials. Ditto all textbooks, which also must be physically checked by the prison staff before being handed out to students. That's quite an undertaking in a program with around 100 inmates enrolled — roughly 80 at Stateville and 20 at Logan Correctional Center, a women's prison about 30 miles northeast of Springfield. The students, divided into groups of about 20, take three classes a week, each class lasting three hours, and have one day of study hall. With four such groupings at Stateville, that's 12 classes a week.

It's a far cry from the early days. The renowned author Alex Kotlowitz, a professor at Northwestern's Medill School of Journalism, has been teaching at Stateville since 2019. He recalls the conditions back then, when teaching was the easy part: "I had 10 incarcerated students and 10 undergrads from Medill. And we would all carpool down once a week, and they would lock us in a room [over the prison gym]."

As hard as Lackey has worked to create a setting in Stateville that mirrors Northwestern, one need merely hear the voices that bounce off the cinder blocks of the hallway outside the Purple Room like screams in a metal garbage can to start to grasp the differences. Here, there are no faculty office hours available to inmates. "They can't even drop a professor a quick email," Lackey says. "They can't follow up on something. They can't look something up online."

Justified or not, the living situation is so oppressive, so filled with distractions and hurdles, both psychological and physical, that, to Lackey, it's a wonder students can read full passages from textbooks, much less produce thoughtful essays — all handwritten — on the application of the philosophies of Kant and Socrates to life in the housing projects. The cells are so small that "if two men are standing up at the same

time, they're quite literally bumping into each other," says Lackey, who has visited the cell house more than once.

The lighting is poor. Cardboard boxes propped on laps serve as writing desks. Traditional pens are forbidden because the hard plastic can be fashioned into shivs. Instead, inmates must use the bendy plastic inserts as their sole writing instruments. "I'm younger than many of the students, and I feel like it would give my hand arthritis," Lackey says.

The biggest challenge, however, is the noise — the relentless, jarring din of the cellblock. "Noise, noise, noise," Lackey says. "If one person in the cell house wants to blast rap music, and you're trying to do homework — I mean, one time we asked if we could donate earplugs, and they said no. I was at Stateville recently and saw one of the students and said, 'You look so exhausted.' He said, 'It's the noise. I just can never sleep for more than a couple of hours.' " At one point, one of the students was trying to do schoolwork while his cellmate, who had been smoking ketamine all day, was having a psychotic breakdown. And then there are the periodic visits from the Orange Crush, the prison's tactical team, which tosses cells, looking for contraband. Textbooks and assignments have been known to get trashed in the process.

"It's not an easy place to visit," echoes Kotlowitz. "Physically, I think, it's the most depressing place I've ever been. The prison's a hundred years old, it's literally falling apart. The guys can't even drink the water there. They get, I think, 23 bottles of water a week, and they went six months without hot water a couple of years ago."

Overcoming such obstacles is a semimiraculous feat in Lackey's view: "Getting a college degree is hard. Getting a college degree from Northwestern is very hard. And getting a college degree from Northwestern University while you're incarcerated at a place like Stateville Correctional Center is nothing short of heroic."

The letter, neatly penned on yellow Care Bears stationery, was addressed to the warden of Cook County Jail. Its author, an 11-year-old girl, wondered if she might satisfy her Catholic school service requirement by doing volunteer work with some of the inmates.
It seemed an absurd request. Allow a young girl to mingle with prisoners? Then again, the sheriff at the time, Richard Elrod, knew the value of feel-good publicity.

And so it was, one day in the fall of 1984, that a squad car pulled up in front of Jennifer Lackey's school in the west suburbs. To the astonishment of her classmates and teachers, the seventh grader climbed in and was soon on her way to 26th and California. A photo in the newspaper captured the moment: Lackey, dressed in a white short-sleeved blouse with her dark hair pulled back, flanked on one side by Elrod and on the other by four female inmates, beaming for the camera while holding a tray of cookies that Lackey and her mother had stayed up most of the night baking.

While her schoolmates chose activities like babysitting and volunteering in retirement homes to satisfy their service requirements, Lackey felt drawn to what at the time was a radical idea: that inmates were as deserving of compassion and humanity as anyone else. "I remember having a conversation with my mother," she says. "I don't know exactly how I put it then, but the feeling was that criminal activity is often attributed to people entirely as arising from agency — that you did this, and you deserve [jail]. And I felt back then, as I still do now, that there are many kinds of social influences at play in how people end up incarcerated."

Her face-to-face meetings with the inmates only confirmed such feelings for her. "I remember one woman was crying and hugged me and gave me a flower made out of tissue. I still have that in my little box of

childhood memories. I think that for many of them, it felt very comforting to be with a child when so many of them were separated from their own. It obviously had a very profound impact on me."




Lackey visited Cook County Jail when she was 11. "It obviously had a very profound impact on me," she says.**Photograph: courtesy of Jennifer Lackey**

As formative as her visits were, Lackey did not envision herself working with inmates as a career. Her mother, Lackey's hero and guiding force, worked a series of office jobs to support her daughter and two older children as a single parent, and to her, there was no greater pursuit than a career in education.

Her mother didn't just preach the value of learning. "When I was 3 or 4, she started taking night classes," recalls Lackey. "And this is, I think, another part of the connection to the work that I do, because my mom really felt that education is empowering. She didn't have a college degree when she had us, but she went back to school and would have us in the cafeteria studying, give us coloring books and stuff. She would take her classes and come home and be cooking in the kitchen and telling us about literature and psychology. I remember her literally walking me through chapters of *Tess of the d'Urbervilles.*" Eventually, Lackey's mother earned a bachelor's from Concordia University in River Forest.
Lackey received her doctorate in philosophy from Brown in 2000 and began teaching at Pomona College, an elite liberal arts school in California. After a stint at Northern Illinois, she joined the faculty of Northwestern in 2007. In 2015, she started teaching a single philosophy class at Stateville, having gotten the prison to agree to it. "I was doing it on my own, with no credit, just a certificate, a very informal thing," she explains. But she had bigger ambitions. She soon drafted a proposal to Northwestern for a degree program "with the same content and the same expectations as I had with my on-campus classes."

**An undercurrent of resentment from some of the guards and staff members at Stateville ripples through the prison. Students have been subjected to strip searches that they feel go beyond routine security measures.**

She laid out specifics, like target enrollment and a timeline, but to mount such a program would take an enormous buy-in from the university. And that proved to be no easy sell. "It's not something that was really

familiar to an institution like Northwestern," Lackey says. The first provost she approached, she says, "needed to be persuaded about how this work fit with the university's mission."

Perhaps the biggest hurdle was the lack of precedent. No top-tier university had ever offered anything remotely like what Lackey had in mind. Offering education programs in prison was one thing. Handing out a four-year degree from one of the best universities in the country was quite another.

Lackey knew she would need money. For that, she applied for and was awarded a $1 million grant from the Mellon Foundation, a giant in higher education philanthropy. Though the foundation administrators initially had concerns over the extent of Northwestern's involvement with the program, Lackey says, they eventually agreed to fund it. "They were tired of certificate programs for incarcerated people, where universities receive credit for having prison education programs but without putting their names behind degrees."

She still needed to persuade Northwestern, though. A new provost, Jonathan Holloway, had said he would allow credits to be granted and tuition waived for such a program, but stopped short of agreeing to grant a degree. Lackey continued to fight. "My personality is a little bit like a bulldozer," she says. "I just don't let things go."

When Holloway left to take over as president of Rutgers in 2020, Lackey and a colleague peppered the inbox of the interim provost, Kathleen Hagerty, asking for updates on the request. Hagerty had been working to secure funding that could sustain the program beyond the Mellon grants, but Lackey was sending so many emails that the provost finally asked for some patience. "I remember I was walking into the grocery store and she called me," Lackey recalls. Hagerty said she was working on it. "I'm about two weeks out from getting to a place where I'm comfortable with all of this."

Finally, in 2021, Northwestern agreed to offer a four-year degree to inmates who completed the program — at no cost to them. Lackey was vacationing with her husband's family in Corrales, New Mexico, when she received word via a Zoom call. "I was sitting at the kitchen table in this Southwestern-style house," she recalls. "It was that vivid, just an absolutely incredible moment. I have written books and won awards, but this was the most emotional moment of my whole career."

The real work was just beginning. There were issues to iron out. "It was like, What is the students' major going to be, and what school is going to confer it, and who's on board? And what happens when the students are released and they haven't finished?" Lackey recalls. "We met weekly — and I mean every single week — for an hour to hammer out all these details." It would take a full year before everything was worked out. But with Lackey fueling the program, there was no doubt it would come together.

"She's kind of a fast talker, a lot of this kind of high energy," says Kotlowitz, the professor and author. "But here's the thing. She has an incredibly generous spirit, one of the most generous people I know. And I don't mean that in that she gives, but in her ability to build these individual connections with these guys. I remember going into that prison early on, and one of the things that I just was astonished by — she not only had the respect and admiration of the students, but she also had the respect and admiration of the corrections officers."



William Peeples takes a seat across from me in a large corner room in the education building. Sun floods through the glass block windows. Clusters of student inmates chat at nearby tables as one sets up a video on a large-screen television on a rolling stand. Lackey had introduced Peeples to me earlier in the day, saying she wanted me to talk to one of her best students — not just at Stateville, but anywhere.

Peeples, in keeping with his Muslim faith, wears a white kufi cap and a neatly trimmed chin beard — mostly white save for a stripe of iron gray. With his gray-framed glasses and placid manner, Peeples, now 60, looks the part of an earnest, if older, student. He drops his head and shakes it gently when I ask him to recount his journey from death row inmate to Northwestern graduate.

Peeples was raised in the Robert Taylor Homes, the public housing high-rises on South State Street that were torn down in the early 2000s. By age 11, Peeples was drinking wine and smoking weed. By his early teens, he had joined the Black Gangster Disciples and dropped out of high school.

On May 18, 1988, according to trial evidence, Peeples, who was living in Schaumburg, stabbed a neighbor at his apartment complex 39 times in the process of robbing her for drug money, killing her, then set fire to her apartment to try to cover up the crime. The victim, Dawn Dudovick, had opened the door to Peeples to lend him a cup of sugar. The *Chicago Tribune* reported that Peeples had shown no remorse during the jury trial and "stared defiantly" at Judge Brendan McCooey as he sentenced him to death.

In his first years in prison, at Menard Correctional Center, Peeples remained violent, attacking a guard and other inmates. It was in 1994, he says, after someone brought him a tape of a Louis Farrakhan sermon, that he began what he calls his "transition." Peeples eventually disavowed the controversial Nation of Islam leader and became an orthodox Muslim. Over the years, as he grew more devout, he also became a voracious reader, studying the dictionary and devouring books by authors such as James Baldwin and Richard Wright.

In 2003, Governor George Ryan commuted the sentences of all those on death row, and Peeples was transferred to Stateville, where he is now serving a life term.

After joining Lackey's class in 2018 and taking as many additional courses as the prison would allow, Peeples wasn't sure what would come next for him. That's when Lackey presented a new opportunity. "Just as class was about to wrap up, she comes in with this stack of papers," he recalls. "She was like, 'These are applications for Northwestern's degree program.' I was like, 'The what?' " Lackey explained that she was rolling out a full program and working hard to get Northwestern to grant a bachelor's to inmates who completed it. She thought Peeples would be an ideal candidate.

"I was a little intimidated," Peeples says. "You've heard of impostor syndrome?" He had thrived in Lackey's class, but he wasn't sure if he was ready for a full-time course load. He took the application as much to humor Lackey as anything.

Before the professor left, she gave Peeples a parting word. "It was almost like this woman read my mind," he recalls. "When I went to turn away, she looked me in the eye and said, 'You can do this — if you want it.' "

Later that day, he returned to his cell and filled out the application. "I wrote probably the best, most heartfelt essays of my life about why I should be in the program." He described the events that brought him to death row: How he grew up in public housing and was physically abused as a child. How he was drawn into gang life and became a thief and murderer to fuel a deepening drug habit. And how his conversion to Islam and the courses he'd taken in prison had reframed his view of himself and led him to search for ways to atone for what he'd done, an act that haunted him still.

"I'm a grandfather," Peeples tells me. "My victim will never be a grandparent because I took her life." Whatever he has been able to achieve academically, he says, he has done to honor not only family members who stood by him but also the victim's memory.

**O**ne thing Lackey may not have anticipated: Not everyone would share her excitement about a major university granting inmates degrees. An undercurrent of resentment from some of the guards and staff members at Stateville ripples through the prison. Students have been subjected to strip searches that they feel go beyond routine security measures. Some days, guards arrive late to take students from their cells to the education building, making them tardy for class. As those inmates are escorted across the prison grounds, they are met with rolled eyes, smirks, and under-the-breath snipes from certain corrections officers.
On some level, the discontentment is understandable. These are convicted criminals, after all — many of them murderers. The guards have led lives that have kept them on the other side of the bars. No one is offering them a free-ride education from Northwestern.

**"We so often think about these guys as some 'others,' as monsters, as people who are evil," says professor Alex Kotlowitz. "And yet, they are more than that. They're who we are. They're us."**

Why do inmates deserve special opportunities? Even Kotlowitz, who has written with empathy and compassion about poverty and perversions of justice, "kind of bumbled" his response to that question during an interview with the *New Yorker* editor David Remnick, he says. His answer today comes down to a question of humanity: "Look, they are a part of us. We so often think about these guys as some 'others,' as monsters, as people who are evil. And yet, they are more than that. They're who we are. They're us. They've made mistakes and they've shown remorse and asked for forgiveness both of themselves and others."
He continues: "We've got, what, two million now behind bars, and they're disproportionately Black and brown people. And if we're going to restore a sense of equity or equanimity to how we deal with people who have committed crimes, then we've got to include them in our community. I'm always reminded of Studs Terkel, who I was fortunate to count as a dear friend and mentor. He had this line — and I'm paraphrasing — that if the community isn't doing all right, then neither am I. The challenge for us is to imagine these men and women as part of our community. If they're not doing all right, neither am I. On that basis, it seems to me perfectly reasonable and fair that we provide them with an education, even a great education."

On one of my visits, I met with Charles Truitt, who took over as Stateville's warden less than two years ago, after the program was already underway. He favors such a progressive stance toward prison education, heaping praise on Lackey and the Northwestern program and calling the graduation ceremony "monumental history" and "probably the pinnacle to my career." He treads carefully, though, when asked about the resentment, even hostility, from guards that had been described to me.


Stateville warden Charles Truitt

Most of the complaints he's heard about the program, Truitt insists, come from people outside the prison walls — perhaps from those wary of reading stories celebrating the student inmates. "As far as my staff, that has never gotten back to me that this is an unacceptable practice here." Still, the former guard hints at disgruntlement. "I would not say it was easy for me to get my staff to understand, but they also understand that I worked this facility three decades ago. I turned keys like they did."

The critical factor in getting guards on board, he says, has been explaining to them the benefits to the Stateville operations. "When you look at the security piece of putting these programs into place, you realize they give the student a sense of worth," he says. "And the more we give them to do, the more things to help them work on themselves," the fewer problems the prison has managing them.

The graduation ceremony, at which the inmates were allowed to freely interact with friends and family and professors and the media, posed a particular challenge for the guards, in terms of not just ensuring security and safety but also forcing themselves to stand back and not interfere with an unabashed moment of jubilation from men they had been accustomed to controlling. Says Truitt: "To say that I was nervous — nervous every second — is an understatement."

On that Wednesday morning in November, 16 students wearing purple robes over white prison-issue sneakers gathered in the Stateville auditorium. On the stage were Northwestern professors and various dignitaries. Among those inmates who were given a chance to speak to the crowd of some 200 that day was William Peeples.

He gripped the sides of the lectern, letting the waves of applause wash over him as he scanned the audience, glancing from side to side before finally sighing softly and pulling the microphone down and close. "Family, friends, and loved ones," he began, his voice breaking slightly. "This moment is literally the culmination of 30 years of people pouring into me." When he first arrived in prison, he had been defined by "drugs, violence, ignorance to the max," he told the group, chopping the air with each of his words. "And instead of judging and condemning me, [the people in the Northwestern program] loved me."

He talked about the woman he had met six years earlier, while sweeping the prison chapel, feeling invisible. She had made him feel seen. "I won't bore you with the story. But what I will say is that there have been very few times in my life where a stranger had made me feel as accepted and valued as that woman there." He pointed to Lackey. "If we had more people like her, these places would not be necessary."

When it came Lackey's turn to speak, her eyes were shining with tears. "I am in awe of and humbled by each of you," she said to the graduates. "You have radically expanded what it means to be a Northwestern student, and you have enriched Northwestern University in ways that will echo for decades to come."

Afterward, graduate Michael Broadway approached Lackey onstage. The two hugged briefly, and Broadway, whose mother was in the audience, swept his arm out as if to say to Lackey, *Look at this.* "Is this everything you envisioned?" he asked her.
"We both laughed really hard," Lackey recalls. "Because the answer was definitely no. It was so beyond anything I could ever have imagined."

A bittersweet feeling hung in the air after the ceremony. Outside the prison auditorium, the graduates posed for group photos, beaming and laughing, shouting at Lackey to stand in the center. On a photographer's count, they flung their mortarboards skyward, and then the student inmates and their professors exchanged one last round of hugs. One of the shots was included in Reuters's weekly selection of the best news photos from around the world.

Peeples has applied for clemency and is awaiting a ruling. In the meantime, he has been hired by the Northwestern program as a teaching fellow for a biology course being taught by a physician from the university's medical school. He may never get out of prison, may never be able to apply his degree outside these walls. But in a broader sense, he sees this achievement as another step on a path toward personal redemption. Guiding him, he says, is a central question: "What am I doing substantively to make the world, and even this environment in here, a better place?"

The ceremony over, he and the other students took off their purple gowns, returning to their prison blues. The guards, barking a little louder than usual, lined the men up and began walking them back to their cells, back into the gray.

Ex complaint # C4

ILLINOIS DEPARTMENT OF CORRECTIONS

**Disciplinary Report**

**Type of Report:** ☒ Disciplinary ☐ Investigative

Facility: Sheridan  Date: 09-11-24

Name of Individual in Custody: Mayfield M31586 ID#: M31586 SMI: ☐ yes ☐ no Race: Blk

Observation Date: 9-11-24 Approximate Time: 1030 ☐ a.m. ☐ p.m. Location: C-33

**Offense(s): DR 504:** 215- disobeying a direct order essential to safety 307- unauthorized movement.

**Observation:** (NOTE: Each offense identified above must be substantiated.) On the above date and approximate time while w/ take was moving into C-33, individual Mayfield M31586 approached me and stated "Hey c/o I'm not taking a cellie, I've murdered my cellie before. It's a security risk" I ordered to main and Lt. Booker. Mayfield was escorted to restrictive housing for Positive ID by state ID and cell house map.

**Witness(es):**

☐ Check if Disciplinary Report Continuation Page, DOC 0318, is attached to describe additional facts, observations or witnesses.

| Reporting Employee (Print Name) | Badge # | Signature | Date | Time |
|---|---|---|---|---|
| Lutica | 9mit | [signature] | 9-11-24 | 1050 ☐ a.m. ☐ p.m. |

**Disciplinary Action:**

**Shift Review:** ☒ Temporary Confinement ☐ Investigative Status Reasons: Nature of offense

Maj. T Rodick 573 — Printed Name and Badge #

[signature] — Shift Supervisor's Signature (For Transition Centers, Chief Administrative Officer) — 9-11-24 Date

**Reviewing Officer's Decision:** ☒ Confinement reviewed by Reviewing Officer Comment: Nature of offense

☒ **Major Infraction**, submitted for Hearing Investigator, if necessary and to Adjustment Committee

☐ **Minor Infraction**, submitted to Program Unit

Mj B. Coco 610 — Print Reviewing Officer's Name and Badge #

[signature] — Reviewing Officer's Signature — 9-11-24 Date

☒ **Hearing Investigator's Review Required** (Adult Correctional Facility Major Reports Only):

Richardson 11940 — Print Hearing Investigator's Name and Badge #

[signature] — Hearing Investigator's Signature — 9-12-24 Date

**Procedures Applicable to all Hearings on Investigative and Disciplinary Reports**

You have the right to appear and present a written or oral statement or explanation concerning the charges. You may present relevant physical material such as records or documents.

**Procedures Applicable to Hearings Conducted by the Adjustment Committee on Disciplinary Reports**

You may ask that witnesses be interviewed and, if necessary and relevant, they may be called to testify during your hearing. You may ask that witnesses be questioned along lines you suggest. You must indicate in advance of the hearing the witnesses you wish to have interviewed and specify what they could testify to by filling out the appropriate space on this form, tearing it off, and returning it to the Adjustment Committee. You may have staff assistance if you are unable to prepare a defense. You may request a reasonable extension of time to prepare for your hearing.

☐ Check if individual in custody refused to sign

ON WATCH — Individual in Custody's Signature — ID#

Rodrlutz — Serving Employee (Print Name) — 3261 Badge # — [signature] Signature

9-12-24 — Date Served — 250 — Time Served ☐ a.m. ☒ p.m.

☐ I hereby agree to waive 24-hour notice of charges prior to the disciplinary hearing.

# STATE OF ILLINOIS -- DEPARTMENT OF CORRECTIONS

## ADJUSTMENT COMMITTEE
## FINAL SUMMARY REPORT

**Name:** MAYFIELD, CALVIN W **IDOC Number:** M31586 **Race:** BLK

**Hearing Date/Time:** 9/17/2024 09:19 AM **Living Unit:** SHE-C8-02-32 **Orientation Status:** N/A

**Incident Number:** 202401541/1 - SHE **Status:** Final

| Date | Ticket # | Incident Officer | Location | Time |
|---|---|---|---|---|
| 9/11/2024 | 202401541/1-SHE | LATIGO, CRYSTAL N | C23 HOUSING UNIT | 06:30 PM |

| Offense | Violation | Final Result |
|---|---|---|
| 215 | Disobeying a Direct Order Essential to Safety and<br>*Comments:refused housing/ stated "security risk"* | Guilty |
| 307 | Unauthorized Movement | Guilty |

| Witness Type | Witness ID | Witness Name | Witness Status |
|---|---|---|---|

**No Witness Requested**

## RECORD OF PROCEEDINGS

Mayfield was read the report and stated "it's a misunderstanding, I'm a single cell, but I never refused housing, I'm just not comfortable with a cellie"

## BASIS FOR DECISION

this committee is satisfied that Mayfield M31586 is guilty of 215 and 307 based on the following:

1. based on the report written by officer Latigo stating that as intake was being moved into C23. Mayfield approached the officer and stated "hey c/o, I'm not taking a cellie, I've murdered a cellie before. it's a security risk"

Lt. Martin and Lt. Booker advised

positive ID made by state ID

## DISCIPLINARY ACTION *(Consecutive to any priors)*

| RECOMMENDED | FINAL |
|---|---|
| 1 Months C Grade | 1 Months C Grade |
| 7 Days Segregation | 7 Days Segregation |
| Transfer (Disciplinary) | Transfer (Disciplinary) |

**Basis for Discipline:nature of offense**

## Signatures

**Hearing Committee**

| | | | |
|---|---|---|---|
| CARLOCK, CRAIG A - Chair Person | [signature] | 09/17/24 | WHI |
| | **Signature** | **Date** | **Race** |
| PETTY, MATTHEW J | [signature] | 09/17/24 | HSP |
| | **Signature** | **Date** | **Race** |

Recommended Action Approved

**Final Comments:** N/A

Ex complaint #06

**Run Date: 9/18/2024 08:16:13**

# STATE OF ILLINOIS -- DEPARTMENT OF CORRECTIONS

## ADJUSTMENT COMMITTEE
## FINAL SUMMARY REPORT

**Name:** MAYFIELD, CALVIN W **IDOC Number:** M31586 **Race:** BLK
**Hearing Date/Time:** 9/17/2024 09:19 AM **Living Unit:** SHE-C8-02-32 **Orientation Status:** N/A
**Incident Number:** 202401541/1 - SHE **Status:** Final

RYAN W WOODS / RWW 9/17/2024 09/17/24
**Chief Administrative Officer** **Signature** **Date**

The committed person has the right to appeal an adverse decision through the grievance procedure established by Department Rule 504: Subpart F.

9-18-24 9Am
**Employee Serving Copy to Committed Person** **When Served - - Date and Time**

Ex Complaint # 06A

212. FRIVOLOUS LAWSUIT
A pleading, motion or other paper filed by the offender for which the court, in accordance with 730 ILCS 5/3-6-3, has found to be frivolous.

213. FAILURE TO REVEAL ASSETS
Failing to fully cooperate in revealing financial assets on the form provided, including tangible and intangible property and real and personal property; providing false or inaccurate information regarding financial assets or dependents on the forms provided; or refusing to cooperate in revealing financial assets on the form provided.

214. FIGHTING
Fighting with another person in a manner that is not likely to cause serious bodily injury to one or the other and that does not involve the use of a weapon.

215. DISOBEYING A DIRECT ORDER ESSENTIAL TO SAFETY AND SECURITY
Willfully refusing, or neglecting to comply with, an order when continued refusal results in a use of force to maintain the safety and security of a facility. This shall include, but not be limited to, refusing to submit to a search, refusing to submit to the application of mechanical restraints, refusing a designated housing assignment or refusing to leave an area.

302. GAMBLING
Operating or playing a game of chance or skill for anything of value, making a bet upon the outcome of any event, or possessing any gambling device. This shall include participating in any lottery.

303. GIVING FALSE INFORMATION TO AN EMPLOYEE
Lying or knowingly providing false information to an employee, either orally or in writing.

304. INSOLENCE
Talking, touching, gesturing or other behavior that harasses, annoys or shows disrespect.

305. THEFT
Department business.
Taking property belonging to another person or entity or the facility without the owner's authorization.

306. TRANSFER OF FUNDS
Causing money to be transferred from one trust fund to another or through an outside source to the account of another offender or entering into contracts or credit agreements without written approval from the Chief Administrative Officer.

307. UNAUTHORIZED MOVEMENT
Being anywhere without authorization or being absent from where required to be or returning late or not traveling directly to or from any authorized destination without prior staff approval.

308. CONTRABAND OR UNAUTHORIZED PROPERTY
Possessing, giving, loaning, receiving or using property that an offender has no authorization to have or to receive and that was not issued to the individual through regular procedures, including the unauthorized possession of food or clothing or the possession of property in excess of that authorized by the facility; or property that has been altered from its original state. This offense includes prescribed medication misuse, such as, but not limited to, prescribed medication that is expired, loose or altered from its original state.

309. PETITIONS, POSTINGS AND BUSINESS VENTURES
Writing, signing or circulating a petition without authorization; unauthorized distributing or posting of any printed or written materials, including surveys; engaging in an unauthorized business venture; or representing oneself as a corporation or official of a corporation without authorization.



Ex Complaint # 07

# State of Illinois -- Department of Corrections Disciplinary Tracking Inmate Disciplinary Card

**Name:** MAYFIELD, CALVIN **IDOC # :**M31586

**Transferred In:** 2024-09-11 **Disciplinary History from 1/1/1998 through 10/7/2024** **Living Unit:** SHE/C8/02/32

| Incident Date<br>Incident/Summ#/Inst.<br>Ticket Type | Offense Codes, Descriptions | | Disciplinary Action |
|---|---|---|---|
| 3/31/2017<br>201701341/1-STA<br>Major | 210 Impairment Of Surveillance<br>308 Contraband/Unauthorized Property | Guilty<br>Not Guilty | Verbal Reprimand |
| 10/14/2019<br>201901832/1-WIL<br>Major | 202 Damage Or Misuse of Property<br>Comments: burnt up outlet/ using a stinger<br>308 Contraband/Unauthorized Property<br>Comments: stinger/ altered tv | Guilty<br><br>Guilty | 1 Months B Grade/Level |
| 9/11/2024<br>202401541/1-SHE<br>Major | 215 Disobeying a Direct Order Essential to Safety and<br>Comments: refused housing/ stated "security risk"<br>307 Unauthorized Movement | Guilty<br><br>Guilty | 1 Months C Grade/Level<br>7 Days Segregation<br>Transfer (Disciplinary) |

Ex complaint # 08

313. DISOBEYING A DIRECT ORDER
Willfully refusing or neglecting to comply with an order, including the refusal to participate in educational testing; to accept a work, educational or housing assignment; or to perform a work assignment.

402. HEALTH, SMOKING OR SAFETY VIOLATIONS
Smoking; tattooing or body piercing, including, but not limited to, piercing of the ear, nose or lip; or disregarding basic hygiene of any person, cell, living or work area, or other place in the facility or its grounds.

404. VIOLATION OF RULES
Willfully disobeying any rule of the facility. If the specific offense is stated elsewhere in this Part, a committed person may not be charged with this offense. The rule violated must be specified in the disciplinary report.

405. FAILURE TO REPORT
Failure to report for a work, educational or program assignment or for transport.

406. TRADING OR TRAFFICKING
Trading or trafficking with any person.

501. VIOLATING STATE OR FEDERAL LAWS
Committing any act that would constitute a violation of State or federal law. If the specific offense is stated elsewhere in this Part, an offender may not be charged with this offense except as otherwise provided in this Section. The State or federal offense must be specified in the disciplinary report.

601. AIDING AND ABETTING, ATTEMPT, SOLICITATION OR CONSPIRACY
Aiding and abetting any person in the commission of any of these offenses; attempting to commit any of these offenses; making plans to commit any of these offenses; soliciting another to commit any of these offenses; or conspiring to commit any of these offenses shall be considered the same as the commission of the offense itself and shall carry the penalty prescribed for the underlying offense. The underlying offense must be specified in the disciplinary report.

**Maximum Penalties Per AD 05.15.100**

| Offense | Maximum Penalties for Offenders per Dept. Direction | | | |
|---|---|---|---|---|
| | Loss or Restriction of Privileges | B or C Grade | Sentence Credit Revocation | Restrictive Housing |
| 100. Violent Assault of any Person | 1 year | 90 days | 1 year | 1 year |
| 101. Arson | 1 year | 90 days | 1 year | 6 months |
| 102a. Assault with Injury | 1 year | 90 days | 1 year | 1 year |
| 102b. Assault | 1 year | 90 days | 6 months | 3 months |
| 102c. Assault of an Individual in Custody | 6 months | 90 days | 6 months | 3 months |
| 103. Bribery & Extortion | 1 year | 0 days | 1 year | 28 days |
| 104. Dangerous Contraband | 1 year | 90 days | 1 year | 1 year |



Ex. Complaint #09

ILLINOIS DEPARTMENT OF CORRECTIONS

**Individual in Custody Request**

Individual in Custody Name: Calvin Mayfield ID #: M31586 Living Unit: C26-A3

Job Assignment: ______ Shift: ______

**Please refer to the directory located in your orientation manual and address proper personnel.**

To: ☐ Clinical Services ☐ OAEVS ☐ Career and Technical Education (CTE) ☐ Business Office ☐ Health Care Unit
☐ Record Office ☐ Placement Office ☐ other (specify): Counselor

for the purpose of (explain):
Can you please tell me if I have single cell designation
Thank you

Have you previously discussed this issue with a staff member? ☐ No ☐ Yes **If yes, name:** ______

______ Individual in Custody's Signature 10/19/24 Date

***INDIVIDUALS IN CUSTODY DO NOT WRITE BELOW THIS LINE***

Remarks by staff (if necessary): Yes, you do.

A. Taylor Print Staff Name Taylor Staff Signature 10/21/24 Date

Distribution: Affected Unit Printed on Recycled Paper DOC 0286 (Rev 3/2024)

Ex. complaint #10

ILLINOIS DEPARTMENT OF CORRECTIONS

# Individual in Custody Request

Individual in Custody Name: Calvin Mayfield ID #: M31586 Living Unit: C26-A3

Job Assignment: ______ Shift: ______

**Please refer to the directory located in your orientation manual and address proper personnel.**

To: ☐ Clinical Services ☐ OAEVS ☐ Career and Technical Education (CTE) ☐ Business Office ☐ Health Care Unit

☐ Record Office ☐ Placement Office ☐ other (specify): ______

for the purpose of (explain):

Have I been submitted for a transfer? If so, where have I been put in for? Thank you.

Have you previously discussed this issue with a staff member? ☐ No ☐ Yes **If yes, name:** ______

______ Individual in Custody's Signature 10/19/24 Date

***INDIVIDUALS IN CUSTODY DO NOT WRITE BELOW THIS LINE***

Remarks by staff (if necessary):

Yes but we can not give location information

______ Print Staff Name ______ Staff Signature ______ Date

Distribution: Affected Unit Printed on Recycled Paper DOC 0286 (Rev. 3/2024)

Ex complaint #11

ILLINOIS DEPARTMENT OF CORRECTIONS

## RESPONSE TO INDIVIDUAL IN CUSTODY'S GRIEVANCE

### Grievance Officer's Report

**Date Received:** October 222, 2024 **Date of Review:** November 1, 2024 **Grievance #:** 10240168

**Individual in Custody Name:** Mayfield, Calvin **ID#:** M31586

**Nature of Grievance:** Discipline

**Facts Reviewed:** Grievant claims transferring to Sheridan on 9/11/24 to attend Northwestern classes. Claims receiving a ticket for disobeying a direct order and unauthorized movement. Claims when given cell assignment noticing there was another individual in the cell. Claims to have talked to officer about needing to be single celled. Claims being directed to wait in the dayroom. Claims housing unit was going to chow and grievant was allowed to go with. Claims showers were ran later and grievant was allowed to get in the shower too. Claims to have then been cuffed and escorted to segregation receiving ticket. Claims to have never refused a direct order and all movement was authorized

**Relief Requested:** I would like whoever investigates this issue to speak directly to c/o Latigo, and ask her to state everything I actually said to her on 9/11/24. I would like the results of the ticket reversed to not guilty and expunged. I do not want any record of it on my master file. I want whoever investigates this issue to contact mental health and have them review my mitt. Records to see if my mental illness (PTSD) played any role in my actions that got me this ticket

**Grievance Officers Response:** After reviewing the disciplinary report and the adjustment committee summary of it, the ticket and charges should be EXPUNGED

**Recommendation:** BASED UPON A TOTAL REVIEW OF ALL INFORMATION, IT IS THE RECOMMENDATION OF THIS GRIEVANCE OFFICER THAT THE GRIEVANCE BE AFFIRMED.

Jacob Stark CCII
Print Grievance Officer's Name

[signature]
Grievance Officer's Signature

(Attach a copy of individual in Custody's Grievance, including counselor's response if applicable)

### Chief Administrative Officer's Response

**Date Received:** 11-6-24 ☑ I concur ☐ I do not concur ☐ Remand

**Action Taken:**

Ex. complaint #12

[signature]
Chief Administrative Officer's Signature

11-6-24
Date

### Individual in Custody's Appeal To The Director

I am appealing the Chief Administrative Officer's decision to the Director. I understand this appeal must, within 30 days after the date of the Chief Administrative Officer's decision, be received by the Administrative Review Board, P.O. Box 19277, Springfield, IL 62794-9277. **(Attach a complete copy of the original grievance, including the counselor's response if applicable, and any pertinent documents.)**

Individual in Custody's Signature ID# Date

Received

OCT 22 2024

Sheridan Correctional Center
Clinical Services

10-40168

Calvin Mayfield — M31586

Present Facility: Sheridan — Sheridan

Nature of grievance:

☒ Personal Property ✓ Staff Conduct ✓ Other: Retaliation, lack of due process
☑ Disciplinary Report 9/11/24 Sheridan

Note: Protective Custody Denials may be grieved immediately via the local administration on the protective custody status notification.

Complete: Attach a copy of any pertinent document (such as a Disciplinary Report, Search Record, etc.) and place in the designated locked receptacle marked "grievance"

Counselor, unless the issue involves discipline, is deemed an emergency, or is subject to review by the Administrative Review Board.
Grievance Officer, only if the issue involves discipline at the present facility or issue not resolved by Counselor.
Chief Administrative Officer, only if EMERGENCY grievance.
Mail to Administrative Review Board, only if the issue involves protective custody, involuntary administration of psychotropic drugs, issues from another facility except personal property issues, or issues not resolved by the Chief Administrative Officer.

Summary of Grievance (Provide information including a description of what happened, when and where it happened, and the name or identifying information for each person involved):

I transfered into Sheridan C.C. on September 11, 2024, to attend the Northwestern Prison Education Program (NPEP).

shortly after my arrival I was given a ticket for "disobeying a direct order (215)" and "unauthorized movement."

I was sent to Seg for seven (7) days, given 30 days "C" grade, put in for a disciplinary transfer, and I was removed from the Northwestern program.

I believe multiple members of the staff conspired to write this false ticket as an act ✓ continued on reverse

Relief Requested:

I would like whoever investigates this issue to speak directly to c/o Cottage, and ask her state everything I actually said to her on 9/11/24.

I would like the results of the ticket reversed to not guilty and expunged. I do not want any record of it on my master file.

I want whoever investigates this issue to contact mental health and have them review my M.H.

☐ Check only if this is an EMERGENCY grievance due to a substantial risk of imminent personal injury or other serious or irreparable harm to self.

☑ Check if this is NOT an emergency grievance

Relief continued on Back →

[signature] Individual in Custody's Signature — M31586 ID# — 10/20/24 Date

(Continue on reverse side if necessary)

Counselor's Response (if applicable) Date Received: ______ ☐ Send directly to Grievance Officer

☐ Outside jurisdiction of this facility. Send to Administrative Review Board, P.O. Box 19277, Springfield, IL 62794-9277

Response:

Print Counselor's Name — Counselor's Signature — Date

Note to individual in custody: If you disagree with the counselor's response you have the ability to forward this grievance with counselor's response to the grievance officer.

EMERGENCY REVIEW: Date Received: ______

Is this determined to be of an emergency nature?

☐ Yes; expedite emergency grievance
☐ No; an emergency is not substantiated. Individual in custody should submit this grievance in the normal manner.

Chief Administrative Officer's Signature — Date

Distribution: Master File; Individual in Custody

Ex Complaint # 12 A

ILLINOIS DEPARTMENT OF CORRECTIONS
Individual in Custody's Grievance

of retaliation against me because I told C/o Latigo that I had previously been single celled and asked her to call IA and Mental health.

I believe Warden woods instructed his staff to falsify my ticket so he could have me transferred out of Sheridan C.C.

Included in this Conspiracy was: Warden woods, LT Martin, Sgt osborne, C/o Latigo, LT Corlock, Sgt Petty, Major or LT Jane Doe (maybe LT Backer?) who escorted me to Seg on 9/11/24 (Female-white Shirt, wore a hat, Brownish blonde hair, white - can be identified by LT Martin, Sgt osborne, and C/o Latigo), ~~and LT Backer~~.

In November 2020, I was violently attacked by my cellie. He died as a result of me defending myself. I spent the following five(5) days on crisis watch due to the violence and trauma of the event.

In December 2022, I attempted suicide. This was a result of my ongoing PTSD as well as other mental health issues. I've been classified a S.M.I. since entering the IDOC in 2012.

Since the attack on me from my cellie I have been housed in a single cell - at Menard, then at Pinckneyville.

When I arrived at Sheridan C.C. I spoke to M.H.P Mullens during the intake process. I briefly explained to her my situation, and my concerns that I would be placed in the cell with somebody.

Shortly after our interview she informed me that she had contacted a LT and informed him about me.

Soon after I was taken to C23 where I was given my cell assignment (A-10). When I saw that there was already someone in that cell I approached C/o Latigo.

I calmly and politely spoke to her. All I said was, "C/o, there is someone in the cell you sent me to. I've been single celled at my last two facilities. Can you please call IA and M.H. to see if it's noted in my file. I do not feel safe in the cell with another person."

C/o Latigo just said o.k. She told me to wait in the dayroom while she called.

While waiting I was talking to the two porters (Tripp + Larry).

C23 was going to chow so C/o Latigo told me to go with. First she put my laundry bag in A-10 so it wouldn't "go missing" - in her words.

After we got back from chow C/o Latigo began running showers. She asked me if I wanted to shower. At this point I did not think there was any problems. C/o Latigo never told me to lock up. She never gave me any orders. She never asked me if I was refusing to comply. She appeared to have no issues with me.

Several minutes later, Sgt osborne, LT Martin, and Jane Doe Major or LT (maybe LT Backer?) came in and told me to cuff up - which I did.

At that point I asked Jane Doe why I was being cuffed up and she said, "for refusing housing." I told her I never refused anything, and she said, "I know, but the warden wants you to go to restrictive housing."

As we was walking to Seg, I briefly explained to Jane Doe about my cellie. She said if my story checks out I should be back to C23 by 8AM (the next day)

Grievance continued on notebook paper. - 2 more additional pages - Pg 2.

---

Relief continued: records to see if my mental illness (PTSD) played any role in my actions that got me this ticket.

I do not want to be retaliated against any further. No transfer to another institution. No "random" cell shakedowns, no frivolous tickets, no random cell changes.

When I was taken to Seg on 9/11/24 I was not allowed to take my new mattress. I would like my old mattress that I have now to be replaced with a new mattress.

I would like the money I lost by not being allowed to use my music subscription reimbursed to me ($20.00), and my State pay lost while in Seg/C grade reimbursed back to me. To be allowed to resume my participation with the Northwestern Program.



Ex. complaint # 12 B

Mayfield M31586

Grievance continued from backside of grievance form

I would eventually have my ticket heard by LT Carlock.

I told him That I never refused anything I told him that C/o Latigo never gave me any orders and she never told me to lock up. she only told me to wait in the dayroom - which I did.

I requested (only the slip provided) that the video be viewed to show that our interaction (me + C/o Latigo) was brief and that I waited in the dayroom. The video was not reviewed

If I had just disobeyed her orders why would she be concerned about my laundry bag? why would she allow me to go to chow or offer me a shower?

After I explained myself to LT Carlock he said, "Here's the deal The warden can either make this all go away, or he can give you thirty (30) days of C grade He just wants to know if you are stable enough to have a cellie" I said "yes, but shouldn't IA and MH make the decision. LT Carlock responded, "C grade it is," Then walked away. I went to C8 a short time later.

I came to Sheridan to attend Northwestern. This is an incredible opportunity for me. I would not have ruined it - before it even began - by disobeying any C/o's orders

This is my first disciplinary ticket in all my years that has sent me to seg I've never been on C grade before. Why start now?

The Administrative Directives state That an officer has to ask the inmate two (2) times if they are refusing housing. They also have to offer alternative



Ex. Complaint #12 C

housing before taking the individual to seg.

C/o Latigo did not do this. Neither did the arriving officers - Sgt Osborne, LT. Martin, or John Doe.

C/o Latigo admits that in the ticket she issued. She writes that I approached her and spoke. She then says contacted LT Martin and LT Backer. That's all she did, and that matches what I said she never gave me any direct orders because I never refused.

Ive been locked up for almost fourteen years. Ive been to crisis twice before this incident. Ive seen many guys refuse housing I would never refuse housing and get a ticket. I know enough to call for a crisis team if it got to that point - but it did not.

When I approached C/o Latigo I believed that I was doing the correct thing. I was informing her of my mental health concerns as well as concerns for my safety.

I was given a ticket for disobeying a direct order - ~~for~~ not going in the cell with another individual, but when I got out of C8 I was placed in a cell by myself

If I now have a single cell, why was I disciplined for informing C/o Latigo I was previously single celled?

504.60(b) states that M.H. should be contacted to review individuals ticket and M.H. record to determine if their actions were due to their mental illness. This was not done in my case. I believe that my PTSD is directly related to my fear of



Ex. Complaint # 12 D

Mayfield M31586

being in a cell with another person, which led me to approaching C/O Latigo.

Attending Northwestern University is very important to me. I believe it will make me a better individual while in prison, as well as greatly improving my chances of success once released. Being found guilty of this ticket not only removed me from the program this year but it also stops me from applying next year. You can not apply if you've had a ticket within the previous year.

I believe this ticket should be expunged from my record for the following reasons:

I never refused housing or disobeyed any orders. I only informed C/O Latigo that I had previously been single celled.

C/O Latigo, backed by her written statements, did not give me any direct orders. She never asked me if I was refusing to lock up or comply. She did not follow the A.D.'s procedure - and neither did the 3 arriving officers

I have a legitimate M.H. illness that would cause me to have issues being in the cell with another individual. This was not considered when hearing my ticket.

I was placed in a single cell when I got out of C grade. If Im single celled now, how could I be disciplined for questioning being placed in the cell with another individual on 9/11/24.

End of Grievance



Ex. Complaint # 12 E

Case: 1:25-cv-04234 Document #: 1 Filed: 04/17/25 Page 84 of 94 PageID #:84



ILLINOIS DEPARTMENT OF CORRECTIONS - OTS

OFFENDER CALL PASS ISSUED

IDOC: M31586 MAYFIELD,CALVIN W Medium B None SHE:SGP:26:A:03:L 1

PRIMARY: UNASSIGNED , PARTICIPANT-SHE710010009

DESTINATION: Northwestern DAY: 10/23/2024 AT: 8:00:00 AM

PASS TYPE: ACADEMIC SCHOOL

COMMENTS: VOLUNTARY Northwestern Study Hall

AUTHORIZED: Stephanie Parks

CELL HOUSE SIGNATURE: ______________ TIME: ____:____

DESTINATION SIGNATURE: ______________ TIME: ____:____

EXIT SIGNATURE: ______________ TIME: ____:____

RETURN SIGNATURE: ______________ TIME: ____:____

Ex complaint # 13

END CERTIFIED Mail Please

ILLINOIS DEPARTMENT OF CORRECTIONS

26 A-3

## Authorization for Payment

Posting Document # ______ Date 10/8/21

Individual in Custody Name Calvin Mayfield ID# [illegible] Housing Unit [illegible]

Pay to ______

Address ______

City, State, Zip ______

The sum of ______ dollars and ______ cents charged to my trust fund account, for the purpose of Postage to be sent as certified Mail

☒ I hereby authorize payment of postage for the attached mail. ☐ I hereby request information on electronic funds transfers to be placed in the attached mail.

Individual in Custody Signature ______ ID# [illegible]

Witness Signature ______

☐ Approved ☐ Not Approved Chief Administrative Officer Signature [illegible]

Postage applied in the amount of 9 dollars and .01 cents.

certified #

70222410000087986646

Distribution: Business Office, Individual in Custody, Mail Room

Legal

Printed on Recycled Paper

10/10

Director Hughs 215

DOC 0293 (Rev. 8/2021)

81850304 [illegible] 10/14/21

Ex. Complaint # 14

**SENDER: *COMPLETE THIS SECTION***

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Acting Director Latoya Hughes
1301 Concordia court
P.O. Box 19277
Springfield, IL, 62794

9590 9402 8422 3156 1471 95

2. Article Number

7022 2410 0000 8798 6646

***COMPLETE THIS SECTION ON DELIVERY***

A. Signature

X [signature]

☐ Agent
☐ Addressee

B. Received by (*Printed Name*)

C. Date of Delivery

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

3. Service Type

☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
Mail
Mail Restricted Delivery
(over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form **3811**, July 2020 PSN 7530-02-000-9053

Domestic Return Receipt

Ex complaint # 14 A

USPS TRACKING #

9590 9402 8422 3156 1471 95

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

United States
Postal Service

• Sender: Please print your name, address, and ZIP+4® in this box•

Calvin Mayfield IDOC #
M-31586

SHERIDAN CORRECTIONAL CENTER
4017 E. 2603 RD.
SHERIDAN, IL 60551

26

A-3

EX. complaint 14 B

RECEIVED

OCT 22 2024

DIRECTOR'S OFFICE

Sheridan

Dear Acting Director Hughes: October 8, 2024

I am writing to you about a serious issue I am having at Sheridan C.C. in the hopes that you can help me.

In November 2020, I was attacked by my cellmate despite my numerous attempts to get the staff to intervien.

My cellmate unfortunately died as a result of me defending myself.

The IDOC investigation cleared me and the state's Attorney declined to press charges.

The attack on me and the resulting death of my cellmate has greatly affected me; Psychologically and emotionally.

I am still suffering from the effects of PTSD as well as other mental health issues I suffer with. I have been classified as S.M.I since coming into the IDOC in 2012.

Due to the almost constant thoughts of the attack and having to kill my cellmate, I attempted Suicide in December 2022.

Since the attack I have been housed in a single cell. First at Menard, then at Pinckneyville C.C.

I applied and was accepted into the Northwestern Prison Education Program. Northwestern is the only top ten university to offer an in person bachelors degree program to individuals in prison - at no cost to the individual. I believe this is an incredible opportunity for me as well as for everyone involved.

Before leaving Pinckneyville I spoke to my mental health professional (MS. Fuik on 9/9/24) about the transfer and the possibility of me being placed in the cell with another individual. She gave me steps to follow upon my arrival in case this did occur.

First, she told me to inform the mental health professional (MHP) during the intake process - which I did.

I spoke to MHP Mullens (9/11/24) and briefly explained the situation and my concerns. After our conversation, she informed me that she had informed a lieutenant about me.

Second, MHP Fuik suggested that I speak to the wing officer of

Ex complaint # 14 C

the housing unit I was assigned to if there were any issues.

I did this as well. When I was taken to the housing unit and saw that there was already an individual in the cell I was assigned to I went to speak to the wing officer.

I calmly approached her and politely said, "C/O, there's someone in the cell you sent me to - I've been single celled at my previous two facilities. Can you call IA and mental health to see if this is noted in my file. I dont feel safe in the cell with anybody."

She said, "OK," and told me to wait in the dayroom.

While I was waiting, they began to run dinner and she told me to go along. But first she put my property bag in the cell so it wouldn't go missing.

When we came back she began to run showers and she asked me if I wanted to take one.

At this point I did not think there were any issues.

A short time later, a Sgt, Lt, and a major (I believe - maybe another Lt.) came in and told me to stand up and cuff up - which I did.

I asked why I was being cuffed and the major (or Lt.) said for refusing housing. I told her that I never refused anything and she said, "I know, but the warden wants you to go to restrictive housing.

I would be issued a ticket by the wing officer for disobeying a direct order and unauthorized movement. This is the first disciplinary ticket I have ever received that has sent me to Seg. As well as the first time I've been demoted to "C" grade.

I would be found guilty without my witnesses being called or interviewed, without the surveillance video being reviewed as I requested, or without mental health being consulted.

Section 504.60(b) Investigation of Major Disciplinary Reports states that, "If the offender has been diagnosed as S.M.I. (Serious Mental Illness) and the sanction for the offense may result in a period of segregation, a MHP shall be assigned to review the offenders mental health records and disciplinary report to determine if the offender's mental illness



Ex. Complaint #14 D

Contributed to the underlying behavior of the offense.

I was given seven(7) days in Segregation, thirty(30) days of "C" grade, and I was recommended for a disciplinary transfer - essentially kicking me out of the institution and the Northwestern Program. All because I informed an officer that I had previously been single celled and had mental health concerns. As my MHP suggested I do.

I am currently on "C" grade, in a seperate housing unit, and I'm Scheduled to be released on October 17, 2024

I do not know my status in the NPEP, If I will be transferred out, and if I will be placed in the cell with another individual when I am released back to population.

I am asking that your office please look into this matter for me.

I do not feel that the ticket was justified but my main concern is that I be allowed to participate in the Northwestern Program.

It is an incredible opportunity and I believe that it will help me to become a better person while inside of prison and greatly increase my potential to succeed upon my release.

I was simply trying to inform Security of my situation and my mental health concerns and trying to avoid any pottential triggers.

I was not trying to disobey any orders or trying to get a ticket and mess up the Northwestern program.

I am not the kind of person to give officers a hard time or not Comply. I didn't even refuse housing on November 25, 2020, even though I knew my cellie was ready to fight. When the Sgt told me to lock up - I did. Just so I wouldn't get a ticket.

I would greatly appreciate any assistance you and your office can give to me. Thank you for your time.

Sincerely,

Calvin mayfield M31586
Sheridan C.C.



Ex. complaint #14 E

J.B. Pritzker
Governor

Latoya Hughes
Acting Director

## The Illinois Department of Corrections

1301 Concordia Court, P.O. Box 19277 • Springfield, IL 62794-9277 • (217) 558-2200 TDD: (800) 526-0844

Name: Mayfield, Calvin

2/26/24
Date

ID# : M31586

Facility: PNK

This is in response to your grievance received on 12/9/24. This office has determined the issue will be addressed without a formal hearing. A review of the Grievance, Grievance Officer/CAO response to the grievance has been conducted. For a grievance that is direct review by the ARB, a review of the Grievance has been conducted.

**Your issue regarding: Grievance dated:** 10/20/24 **Grievance Number:** 10240168 **Griev Loc:** SHE

- ☐ Medical
- ☐ Dietary
- ☐ Personal Property
- ☐ Mailroom/Publications
- ☐ Staff Conduct
- ☐ Commissary / Trust Fund
- ☐ Conditions (cell conditions, cleaning supplies, etc.)
- ■ Disciplinary Report: Dated: 9/11/24 Incident # 202401541/1-SHE
- ☐ Other

**Based on a review of all available information, this office has determined your grievance to be:**

- ☐ Affirmed
- ☐ Denied, in accordance with DR504F, this is an administrative decision.
- ■ Denied, this office finds the issue was appropriately addressed by the facility Administration.
- ☐ Denied as the facility is following the procedures outlined in DR525.
- ☐ Denied as procedures were followed in accordance with DR 420 for removal/denial from/for an assignment.
- ☐ Denied as this office finds no violation of the grievant's due process in accordance with DR504.80 and DR504.30. This office is reasonably satisfied the offense cited in the report was committed.
- ■ Other: Records indicate disciplinary report #202401541/1-SHE was expunged.

FOR THE BOARD: [signature]
Ryan Nothnagle
Administrative Review Board

CONCURRED: [signature]
Latoya Hughes
Acting Director

CC: Warden, PNK Correctional Center
Mayfield, Calvin, ID# M31586

*Mission: To serve justice in Illinois and increase public safety by promoting positive change for those in custody, operating successful reentry programs, and reducing victimization.*

**www.illinois.gov/idoc**

Ex. Complaint # 15

# State of Illinois -- Department of Corrections Disciplinary Tracking Inmate Disciplinary Card

**Name:** **MAYFIELD, CALVIN** **IDOC # :M31586**

**Transferred In: 2024-11-06** **Disciplinary History from 1/1/1998 through 2/28/2025** **Living Unit: PNK/R4/D /67**

| Incident Date<br>Incident/Summ#/Inst.<br>Ticket Type | Offense Codes, Descriptions | | Disciplinary Action |
|---|---|---|---|
| 3/31/2017<br>201701341/1-STA<br>Major | 210 Impairment Of Surveillance<br>308 Contraband/Unauthorized Property | Guilty<br>Not Guilty | Verbal Reprimand |
| 10/14/2019<br>201901832/1-WIL<br>Major | 202 Damage Or Misuse of Property<br>Comments: burnt up outlet/ using a stinger<br>308 Contraband/Unauthorized Property<br>Comments: stinger/ altered tv | Guilty<br><br>Guilty | 1 Months B Grade/Level |

Ex. Complaint # 16

JB Pritzker
Governor

Latoya Hughes
Acting Director

**The Illinois Department of Corrections**

Pinckneyville Correctional Center
5835 State Route 154 • Pinckneyville, IL 62274-3410 • (618) 357-9722 TDD: (800) 526-0844

July 11, 2024

Calvin Mayfield M31586 [2C59]

Copy

RE: Northwestern Prison Education Program

Congratulations!

By your submission of the NPEP application, you have been selected for a Northwestern Prison Education Program interview.

The interviews will take place, here at Pinckneyville Correctional Center on Tuesday, July 23rd.

You will be issued a call pass for that day when a time has been determined.

Education Dept

Ex. complaint # 17

J.B. Pritzker
Governor

Latoya Hughes
Acting Director

**The Illinois Department of Corrections**

1301 Concordia Court, P.O. Box 19277 • Springfield, IL 62794-9277 • (217) 558-2200 TDD: (800) 526-0844

Name: Mayfield, Calvin

ID#: M31586

Facility: PNK

3/17/25
Date

This is in response to your grievance received on 12/23/24. This office has determined the issue will be addressed without a formal hearing. A review of the Grievance, Grievance Officer/CAO response to the grievance has been conducted. For a grievance that is direct review by the ARB, a review of the Grievance has been conducted.

**Your issue regarding: Grievance dated:** 12/19/24 **Grievance Number:** ______ **Griev Loc:** SHE

- ☐ Medical
- ☐ Dietary
- ☐ Personal Property
- ☐ Mailroom/Publications
- ☐ Staff Conduct
- ☐ Commissary / Trust Fund
- ☐ Conditions (cell conditions, cleaning supplies, etc.)
- ☐ Disciplinary Report: Dated: ______ Incident #
- ☒ Other School: (11/1/24) Claims should be allowed to re-enroll in Northwestern Prison Education Program after disciplinary report was expunged.

**Based on a review of all available information, this office has determined your grievance to be:**

- ☐ Affirmed
- ☐ Denied, in accordance with DR504F, this is an administrative decision.
- ☐ Denied, this office finds the issue was appropriately addressed by the facility Administration.
- ☐ Denied as the facility is following the procedures outlined in DR525.
- ☐ Denied as procedures were followed in accordance with DR 420 for removal/denial from/for an assignment.
- ☐ Denied as this office finds no violation of the grievant's due process in accordance with DR504.80 and DR504.30. This office is reasonably satisfied the offense cited in the report was committed.
- ☒ Other: This office reached out to SHE CC and was advised grievant does not meet the qualifications for NPEP. -Denied.

FOR THE BOARD: [signature]
Ryan Nothnagle
Administrative Review Board

CONCURRED: [signature]
Latoya Hughes
Acting Director

CC: Warden, PNK Correctional Center
Mayfield, Calvin, ID# M31586

*Mission: To serve justice in Illinois and increase public safety by promoting positive change for those in custody, operating successful reentry programs, and reducing victimization.*

**www.illinois.gov/idoc**

EX. complaint #18